### PAGE et al. v. UNITED STATES.

No. 1874.

United States District Court
E. D. Louisiana, New Orleans Division.

May 20, 1952.

Bloch, McCloskey & Dennery and Joseph McCloskey, all of New Orleans, La., for libelants.

John N. McKay, U. S. Atty., Lansing L. Mitchell, Asst. U. S. Atty., New Orleans, La., for respondent.

WRIGHT, District Judge.

This case presents the unusual situation in which the owners of a vessel in distress, having sought and received the aid of the Coast Guard, now seek to hold the United States for the loss of their vessel. They allege incompetence and negligence on the part of the crew aboard the Coast Guard vessel which answered their call for help.

The scene of this disaster is treacherous Lake Pontchartrain. Libelants were the owners of the auxiliary sloop Duchess, a 24-foot cabin sloop equipped with a four horsepower Kermath auxiliary engine. On October 17, 1948 the Duchess proceeded out of the New Basin Canal and into Lake Pontchartrain. Aboard were one of the libelants, his wife and father-in-law. A small craft warning was flying from the Coast Guard Station at the mouth of the New Basin Canal, but as the Duchess passed the station at about 2 P. M. that day the lake was calm and the breeze was offshore, being from the southwest not in excess of eight miles per hour. At about 3 P. M., however, the wind shifted to north, northwest and increased to a sustained velocity of twenty-seven miles per hour at 3:25 P. M. with gusts to thirty-five miles per hour. The wind was accompanied by rain and waves variously estimated from three to six feet in height.

When the squall struck, the Duchess, which had been sailing from east to west and from west to east some 150 to 200 yards off the concrete seawall, headed for home. At the time she was headed west, approximately 300 yards east of the mouth of the Canal. Her mainsail and jib were dropped and the auxiliary engine was brought into use as the propelling force. Immediately the Duchess began experiencing difficulty in bringing her bow into the wind and sea and consequently she was being set toward the seawall, which forms the southern shore of Lake Pontchartrain. A Coast Guard boat coming out of the New Basin Canal and into the lake was hailed by the skipper of the Duchess and the attempt at rescue began.

On duty at the Coast Guard Station at the head of the canal were a chief boatswain's mate, boatswain's mate and a seaman. There was also assigned to the station a 38-foot picket boat which is a cabin-type vessel 38 feet long powered with a single screw 225 horsepower engine. When the squall broke, the boatswain's mate and the seaman were ordered by the chief to warm up the engine in the picket boat and prepare to go to the rescue of the sail boats in the lake which always fall victim to Lake Pontchartrain squalls. The picket boat started out of the canal into the lake, and the chief, seeing the Duchess in distress from his vantage point in the station, called to the picket boat to proceed to her aid.

The testimony is completely at variance as to the distance off the seawall the Duchess was when she was first approached by the picket boat. The witnesses aboard the Duchess all testified that she was from 100 to 150 yards off the seawall and some 300 yards east of the entrance into the New Basin Canal. The Coast Guard witnesses, including the chief boatswain's mate, who remained at the Coast Guard Station, testified that the Duchess was approximately 50 feet off the seawall. There is only one disinterested witness. He happened to be standing on the seawall nearby. He also testified that the Duchess was approximately 50 feet off the seawall at the time in question.

The picket boat approached the Duchess bow-on and after two unsuccessful attempts, succeeded in getting a heaving line aboard her. On receiving the heaving line, one of the libelants herein, the skipper of the Duchess, made it fast to the Sampson post on her bow. Whereupon the Coast Guard vessel backed down. The heaving line became taut for a moment and then slack. When it was pulled aboard the Duchess, there was no hawser at the end of it.

With the Duchess still being set in the direction of the seawall, her skipper dropped anchor and continued using the engine in an effort to offset the pressure of the wind and waves. The Duchess, however, dragging her anchor, continued to be set against the seawall. Her skipper thereupon shut down her engine and jumped overboard in an effort to fend his vessel off the seawall which she was now rapidly approaching.

With the vessel now parallel to the seawall and lying alongside it facing west, the Coast Guard boat came in again bow-on at an angle of approximately ninety degrees in an effort to retrieve the heaving line in order to pass the towing hawser back to the Duchess. After considerable difficulty one end of the heaving line was gotten aboard the picket boat, the hawser was made fast thereto and taken aboard the Duchess where it was bent around the Sampson post. With the bow of the Duchess facing west and with a hawser running from her bow to the bow of the picket boat which was facing

south, the picket boat began to back away. Mr. Curtis, libelant's father-in-law, attempted without success to weigh anchor, whereupon libelant left the tiller of the Duchess to assist him. While this operation was going on the Coast Guard boat began to be set by the wind and waves in the direction of the seawall so that the towing hawser became bent around a piling in the lake fifty feet from the seawall. With the Duchess now some few feet off the seawall and headed generally northwest, with the Coast Guard boat approximately thirty feet off the seawall and headed generally east in the trough of the waves, and with the towing hawser between them bent around the piling, the boatswain's mate in charge of the picket boat ordered his seaman to let go the hawser. Free from the piling, the towing hawser and the Duchess, the Coast Guard boat maneuvered to safety while the Duchess drifted back on the seawall where she broached and sank.

Libelants contend that the duty owed by the Coast Guard under the circumstances of this case is one of ordinary and reasonable care and the failure on the part of the Coast Guard to exercise ordinary and reasonable care makes the government liable in damages under the Public Vessels Act, 46 U.S.C.A. § 781 et seq. They charge three counts of negligence: first, the Coast Guard vessel approached the Duchess bow-on in its attempt to rescue her; second, there was no towing hawser tied to the end of the heaving line when the heaving line was first taken aboard the Duchess; and third, after taking the Duchess in tow the Coast Guard let go the towing hawser when it became fouled around the piling.

The respondent contends that it owed no affirmative duty of care to the Duchess; that if it does owe a duty, the standard of care required must be less than that required of a salvor; that the standard of care required of a salvor is good faith and abstention from willful misconduct or culpable negligence; that there has been no proof of bad faith, willful misconduct or culpable negligence. Respondent further contends that before it can be held liable there must be proved a distinguishable injury to libelants which was caused by the

Coast Guard and which would not have occurred if the Coast Guard had not come to the rescue. In other words, respondent says libelants must show that but for the intervention of the Coast Guard the Duchess would have been saved.

■ Under the Public Vessels Act the United States is liable for damages caused by her public vessels and this liability covers damages resulting from negligence of personnel in the operation of such vessels. Canadian Aviator v. United States, 324 U. S. 215, 65 S.Ct. 639, 89 L.Ed. 901. Damages attributed to negligence of Coast Guard vessels and personnel may be recovered under this act. Ladd v. United States, D.C., 97 F.Supp. 80. Whether the United States may be liable for any negligent acts of the Coast Guard in the field of rescue need not be here decided, for as will be seen, the acts of the Coast Guard in its unsuccessful attempt to rescue the Duchess do not under the circumstances of this case constitute negligence. Further, assuming negligence has been shown, libelants have failed to prove a distinguishable injury and consequently may not recover.

■ Negligence is the failure to exercise ordinary and reasonable care in the circumstances proved. In appraising the acts of the Coast Guard personnel, therefore, it is not enough to sit here in the comfort of our chambers, slide rule in hand, and decide what should have been done. The only way to determine negligence or lack thereof in this case is to place ourselves, in our mind's eye, on the bouncing bow of a 38-footer in squall-ridden Lake Pontchartrain with the wind and sea from the north and the concrete seawall a few feet to the south, and then decide whether or not the acts of the Coast Guard personnel in the circumstances of this case evidenced a lack of ordinary and reasonable care. Paraphrasing the words of the great Greek soldier, Paulus, in addressing the citizenry, some of whom had been complaining of the conduct of the war in Macedonia and offering suggestions as to how it might be better fought: "Let the armchair strategists come with me to Macedonia."

■ The first charge of negligence levelled at the respondent is that the Coast Guard vessel approached the Duchess bow-on in an attempt to rescue her. The decision to approach bow-on was made by the boatswain's mate in charge of the vessel. It was his best judgment as to how best to extricate the Duchess from her perilous situation. Unless that judgment in itself shows a lack of skill, it cannot be said to amount to negligence. The fact that the skipper of the Duchess or anyone else might have done it some other way is aside the point. As a matter of fact this court believes that the bow-on approach was the proper approach. At the time the picket boat first came upon the Duchess the seawall was between fifty to three hundred feet to the south with a thirty-five mile wind and four to six foot choppy sea coming out of the north. In view of the testimony of the disinterested witness Bart the position was probably considerably closer to fifty feet.

To have approached the Duchess so as to give her a stern line would have required placing the stern of the picket boat, where her draft is deepest, almost as close to the seawall as the Duchess was, thereby exposing the picket boat to grounding and consequent destruction from the wind and waves. It is true that there is some evidence in the record to show that in this particular spot the water was six feet deep almost to the seawall. However, it is also clear that in many places along the seawall the depth of the water did not exceed one foot. The boatswain's mate testified that he planned, after getting a line on the Duchess, to back the picket boat into the wind and sea until enough sea room was available to come about and take the Duchess in tow over the stern. Under the circumstances and assuming that the Duchess at the time in question was not much more than fifty feet from the seawall, it would appear that it was not only not negligence to approach her bow-on but that it would have been a serious mistake of judgment to have done otherwise.

■ Secondly, libelants contend that the personnel of the picket boat were negligent because when the heaving line was

first taken aboard the Duchess there was no hawser attached to it. The seaman Ford testified that he made the heaving line fast to the hawser before he threw the monkey's fist at the other end of the heaving line to the Duchess. Page testified that on receiving the heaving line he bent it around the Sampson post on the bow of the Duchess, that thereupon the picket boat began to back off, that the heaving line then became taut for a moment and then slack and that when it was pulled aboard, there was no hawser at the other end.

While it is difficult to say with certainty what actually happened during these action-filled minutes when the men in both boats were fighting the wind and sea to save their vessels, it would appear that when Page bent the heaving line around the Sampson post, the boatswain's mate, inside the cabin of the picket boat with rain and waves hitting both the bow of the picket boat and the bow of the Duchess, was unable to see the size of the line which Page was bending around the Sampson post. It would be natural for him to assume that it was the hawser because it is hard to conceive why the heaving line should be so bent. In any event, seeing the line bent around the Sampson post he backed away. The consequent strain parted the lines where they were made up.

If this be an accurate appraisal of the situation, obviously then libelants' second charge of negligence disappears. Any other appraisal of this situation would convict the seaman Ford of perjury and this the court is unwilling to do since the apparent conflict in the testimony of the witnesses Page and Ford can be reasonably reconciled.

■ Libelants' third charge of negligence is based on the picket boat letting go the towing hawser when it became fouled around the piling. At the time the hawser became fouled the Duchess had been towed only a few feet from the seawall and the picket boat itself was dangerously approaching the seawall, buffeted by the wind and sea in the trough of the waves. Again the boatswain's mate, exercising his best judgment, decided that it was necessary to let go his tow in order to save his boat.

Under the circumstances it cannot be said that this judgment was in any sense faulty, particularly in view of the fact that letting go the hawser would simply mean that the Duchess would return to the seawall whence she came. Since the libelant Page had been successful in holding her off the seawall before until the Coast Guard got a line on her, there was no reason for the boatswain's mate to believe that she would necessarily be unsafe in that position again.

■ Why the Coast Guard boat, after taking the Duchess in tow, began to be set against the seawall is not entirely clear. The boatswain's mate testified that he backed into the wind and sea, away from the seawall. He also testified that there was no one at the tiller of the Duchess while he was so backing. Further, Page testified that he left the tiller to assist his father-in-law who was experiencing difficulty in weighing anchor. Under the circumstances it is possible, if not probable, that the inability of the picket boat to keep her stern to the wind and sea during the towing operation was at least contributed to by the fact that her tow was apparently still anchored with no one at the tiller. In any event the inability of the Coast Guard boat to keep her stern into the wind and sea is not in itself proof of negligence.

■ Finally, libelants' right to recover is proscribed by the fact that a distinguishable injury is not shown resulting from the efforts of the Coast Guard. Other than the Coast Guard vessel, there was no boat standing by to undertake the rescue of the Duchess. The fact that the Coast Guard had undertaken to rescue the Duchess did not in any way deter other boats from coming to her aid. It appears from the evidence that the Duchess was headed for the seawall when the Coast Guard intervened. The fact that she arrived there anyway in spite of the salvage efforts of the Coast Guard does not make the Coast Guard responsible for her destruction. The proximate cause of that destruction was the wind and sea. The fact that the Coast Guard was unable to save her from her fate cannot make the respondent liable in damages.

Decree for respondent.