Emil FOLTTING

v.

Rene KAEVANDO and United States of America.

Civ. A. No. 69-B-38.

United States District Court,
S. D. Texas,
Brownsville Division.

March 11, 1971.

**586**

Mandell & Wright, Sidney Ravkind, Houston, Tex., for plaintiff.

Cox, Wilson, Duncan & Black, John William Black, Brownsville, Tex., for defendants Rene Kaevando and Posey Allen Thornton.

Anthony J. P. Farris, U. S. Atty., and Jack Shepherd, Asst. U. S. Atty., Houston, Tex., for the Government.

## MEMORANDUM AND ORDER

GARZA, District Judge.

Plaintiff Emil Foltting has sued Rene Kaevando as owner of the O/S RIDALA, a shrimping vessel, its captain, Posey Allen Thornton, and the United States of America, for injuries he allegedly received in connection with rescue operations conducted by the Coast Guard. His action against the boat owner and his captain has been settled and is not before the Court. The Court has tried his cause of action against the United States and after the receipt of evidence, the parties were allowed to present briefs. In trying to recover against the United States, Foltting claims that Coast Guard personnel that rescued him from the sinking O/S RIDALA were negligent and also that the boat used by the Coast Guard in rescuing him was unseaworthy and not fit for the purpose of rescue.

Plaintiff Foltting was a member of the crew of the O/S RIDALA, which ran aground near the entrance to Brazos-Santiago Pass. The other crew member on board the O/S RIDALA was the captain, Posey Allen Thornton. They had been on a shrimping venture for six or seven days when trouble developed with the port tow block, and Captain Thornton decided to return to his home port. As the RIDALA was approaching the jetties at the Brazos-Santiago Pass, the steering mechanism failed and she went aground.

Captain Thornton radioed the Coast Guard for assistance, and a 40 foot utility boat with BM3 Boyle F. Wells, Jr. in charge was dispatched to its aid. The Coast Guard 40 footer has been described as a utility boat used for shallow draft and offshore running. There was a norther blowing, with a wind at some 26 miles per hour and the seas were running six to eight feet, with ten to twelve foot waves near the shore. The Coast Guardsmen attempted to free the RIDALA, but were unable to do so, and Captain Thornton decided that they should be removed from the stranded vessel, which was breaking up and without power. Because of the conditions of the seas, it was impossible for the Coast Guard boat to come along side the RIDALA, and it was necessary for the crew of the RIDALA to jump in the water after lines and life rings were thrown to them by the Coast Guard. Plaintiff Foltting was the first to jump into the water and to be brought aboard

the Coast Guard vessel. Evidence before the Court shows that when brought aboard, Foltting was shivering and shaking, and a member of the crew of the Coast Guard vessel by the name of David A. Sheffield has testified that he wrapped a blanket around Foltting and took him to a cabin on the Coast Guard boat, which was a room from six or eight feet long and ten feet wide, that had nothing in it but a map canister. In fact, the room was called the map room. Sheffield says that he told Foltting to sit down with his back to one of the walls and to stay there, and that this was the position he was in when he last saw him. He later went out to bring Captain Thornton in.

Captain Thornton was brought on board the Coast Guard 40 footer and was directed to the room where Foltting had been placed. Thornton has testified that he was on the steps leading to the map room and holding on to the sides of the door, and the Coast Guard boat got under way to return to its station. He has testified that word came down from the crew to hold on, and that he understood this to mean to brace themselves.

Apparently Plaintiff Foltting had stood up and was holding to the map canister, when the Coast Guard boat got under way. He says that his feet went out from under him and he fell to the floor, landing on his right hip and breaking it.

Both Plaintiff Foltting and Captain Thornton, who also has testified that he fell to the floor, were experienced seamen and both have testified that the best position to have been in as the boat got under way was to have been in a sitting position.

▌ Plaintiff alleges that Coast Guard personnel were negligent in not advising them as to how to position themselves. The Plaintiff and the Captain were just as aware of the conditions as the Coast Guard personnel, and there is no evidence before the Court under which the Coast Guard personnel could be declared negligent in any respect.

The Plaintiff has presented expert testimony from a marine surveyor to attempt to prove that the Coast Guard vessel was unseaworthy because of its failure to provide equipment designed for rescue, such as seat belts or a hand rail in the cabin where the Plaintiff and the Captain were placed.

There is no affirmative duty on the part of the Coast Guard to rescue or furnish assistance to a vessel in distress; the decision to undertake or abandon is discretionary. United States v. Gavagan, 280 F.2d 319 (5 Cir. 1960).

The assertion of the Plaintiff that the United States Government was negligent in failing to outfit the Coast Guard utility boat as a rescue vessel, thereby making it unseaworthy, is misplaced. The language of Chief Judge Aldrich of the First Circuit in United States v. Sandra & Dennis Fishing Corp., 372 F.2d 189 (1 Cir. 1967), cert. den. Roberts v. United States, 389 U.S. 836, 88 S.Ct. 48, 19 L. Ed.2d 98 is a complete answer to the Plaintiff's allegations. In that case he states:

"Before discussing these findings, however, we first consider the extent of the obligation that the Coast Guard owed the claimants. We think it clear that the applicable statutes, 46 U.S.C. §§ 741–752, 781–790, do not amount to a general undertaking by the United States to provide rescue service on demand. See Lacey v. United States, D.Mass., 1951, 98 F.Supp. 219. The case of Indian Towing Co., Inc. v. United States, 1955, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48, upon which claimants place principal reliance, did not impose liability upon the government because the Coast Guard maintained insufficient equipment—their navigational aids—per se, but because it failed to maintain a particular aid after the plaintiff had been led to believe it could rely on it. How much equipment the Coast Guard is to possess, and how much money it is to

spend measured, necessarily, by Congressional appropriations, must be for the government's uncontrolled discretion. *We can recognize no obligation upon the Government either to have had the 95 (Coast Guard Patrol Boat CG–95321) available, or to have had on board any particular equipment."* (Emphasis supplied.) To the same effect, see Frank v. United States, 250 F.2d 178 (3 Cir. 1957), cert. den. 356 U.S. 962, 78 S.Ct. 1000, 2 L. Ed.2d 1069. The failure of the Coast Guard 40 footer to have the seat belts or the hand rails cannot make the Coast Guard negligent or its utility boat unseaworthy.

There is no question that Plaintiff Foltting broke his right hip, and as a result has been declared permanently unfit for duty. The Plaintiff, however, has a history of chronic alcoholism and as a result of this, suffers from a chronic brain syndrome. In 1964, he suffered a terrific beating that even led to his loss of memory. There is evidence that the beating that he suffered and his chronic brain syndrome manifests itself by instability and lack of coordination in his legs. Plaintiff, an experienced seaman, knowing of his condition and knowing that the safest position to be in was to be seated, as Coast Guardsman Sheffield advised him, should not have been standing when the Coast Guard boat got under way. His fall and resultant injury were of his own making.

Finding no negligence on the part of the United States Coast Guard, either in the way the crew of the 40 footer acted or in the equipment that was on board, Plaintiff Foltting cannot recover and this cause of action must be and it is hereby dismissed.

This memorandum constitutes the Findings of Fact and Conclusions of Law of this Court, and is a Final Judgment herein.

The Clerk will send copies of this Memorandum and Order of Dismissal to counsel for the parties.