Cecil **DREHER** et al., Plaintiffs,

v.

**UNITED STATES** of America,
Defendant.

Civ. No. 52044–OJC.

United States District Court,
N. D. California.

Sept. 27, 1972.

Grossman, Ackerman & Peters, San
Francisco, Cal., for plaintiffs.

James L. Browning, Jr., U. S. Atty.,
Robert J. Finan, Asst. U. S. Atty., San
Francisco, Cal., for defendant.

## MEMORANDUM FOR JUDGMENT

OLIVER J. CARTER, Chief Judge.

This admiralty action was tried to the
Court without a jury. Jurisdiction exists pursuant to the provisions of the
Suits in Admiralty Act, 46 U.S.C. §§
741–752, and the Public Vessels Act, 46
U.S.C. §§ 781–790. Most of the facts
were uncontested. The Court having
heard all the testimony, listened to and
read the depositions offered into evidence, referred to the documentary evidence, and being fully advised in the
premises finds as follows.

On February 12, 1969, the plaintiffs,
Gevas and Wassenhove, departed Noyo
Anchorage for Eureka in the fishing
boat BEVAN, owned by plaintiff Dreher. Shortly after clearing the Anchorage, Gevas decided to return to the
Noyo River because the "iron mike",
equivalent to an automatic pilot, was not
functioning properly.

The Noyo Anchorage is located approximately one to one and a half miles
south of Fort Bragg, California (See

Exhibit A). The Anchorage may roughly be described as a semi-circular indentation in the Northern California coastline with the Noyo River mouth located approximately half way around the semi-circle on the eastern side. Extending from the river mouth westward into the Anchorage are two jetties, about 60–70 yards apart, which form a corridor into the Noyo River. There are portions of the Anchorage which extend north and south of the jetties. The area north of the jetty will be referred to as Area A as it was labelled at the trial.

As the BEVAN attempted to re-enter the Noyo River it struck the south jetty and was holed in the bow. Although there is a dispute as to whether the BEVAN then backed into the north jetty, it is undisputed that its rudder was rendered useless. Seeing the BEVAN's plight, the owner of the Sea Valley came down the River to the BEVAN's aid. The SEA VALLEY, another fishing boat, was maneuvered between the BEVAN and the jetty, threw the BEVAN a line and began towing the BEVAN out into the Anchorage (heretofore Anchorage Area A) away from the jetty. Waiting in the deep part of the Anchorage further out towards sea was the 82 foot Coast Guard vessel POINT LEDGE, commanded by Lt. (jg) Williams.

The POINT LEDGE was returning to its base in the Noyo River after testing its engines, when Lt. Williams observed the BEVAN strike the jetty. Immediately, the crew on the POINT LEDGE began to break out the tow line. As towing preparations continued, a large wave struck over the POINT LEDGE's stern injuring two crewmembers. At this time the POINT LEDGE was turned into the swells to avoid further mishaps.

The parties disagree as to the weather conditions in the Anchorage at this point. Plaintiffs claim that there were only small swells in the Anchorage and that Area A was relatively calm. Defendant's witnesses testified that the swells were running 6–8 feet inside the Anchorage. The Court finds the testimony of Lt. Williams and John Figueirido, skipper on the SEA VALLEY, to be the more convincing. Additionally, the testimony of Ray Welch, a fisherman of considerable experience in the Noyo area, and of John Figuerido, establishes that there were waves and breakers in Area A. Furthermore, the wind was blowing from the northwest at approximately 20–30 miles per hour.

When the SEA VALLEY began its tow, Figuerido could see that the BEVAN was holed and without rudder control (Exhibit 5–D). At this point some radio communication was made between the SEA VALLEY and the POINT LEDGE. Plaintiffs contend that the SEA VALLEY was ordered to bring the BEVAN out to the POINT LEDGE. Lt. Williams was unable to remember exactly what was said. It is clear that the SEA VALLEY was towing the BEVAN out of the Anchorage towards the POINT LEDGE when its tow rope parted. At this time the POINT LEDGE came forward and took up the tow.

When the POINT LEDGE picked up the tow, the BEVAN was pointed in a southwesterly direction out to sea. The BEVAN was towed out of the Anchorage. Just after beginning the tow, a floatable pump was passed to the BEVAN from the POINT LEDGE. It worked only sporadically. Apparently debris adrift inside the BEVAN was being sucked up by the pump, rendering it useless.

By towing the BEVAN to sea, Lt. Williams intended to line the BEVAN up for an approach back into the Noyo River by towing it in a slow semi-circle. However, once outside the Anchorage the effect of a strong ocean current was to set both vessels to the south or southeast. As Lt. Williams attempted to execute his plan and swing back to the north, a large swell almost capsized the BEVAN; Gevas and Wassenhove jumped ship. The POINT LEDGE immediately broke off the tow and rescued the two plaintiffs. By this time the

BEVAN was down by the bow. Thereafter further attempts were made to resume the tow by getting a grappling hook on to the stern. These attempts were unsuccessful due to the sea conditions and no further attempts to hook the BEVAN were made.

Throughout the day the weather conditions had been getting worse; the winds were rising as were the seas. Due to these conditions and because Lt. Williams was concerned about the extent of the injury to his two crewmembers, he decided to return to the Noyo River. A swimmer from the POINT LEDGE reached the BEVAN and unsuccessfully attempted to use the clogged pump. Being unable to find a suitable fitting on the BEVAN's stern for further towing, he let out the BEVAN's anchor. The POINT LEDGE returned to its base and the BEVAN drifted until its anchor caught approximately 1–1½ miles south of the Noyo River and ½–¾ miles off shore.

On returning to base in the Noyo River, Lt. Williams contacted his headquarters in San Francisco for weather information and advice. The weather forecasts did not show any substantial improvement in the sea or wind conditions that day. Late in the afternoon, Lt. Williams drove south down the coast and observed the BEVAN capsized where its anchor was holding it. No further attempts were made at rescue that day. By the next morning the BEVAN had sunk.

Plaintiffs have brought this action against the Coast Guard for damages, alleging that the BEVAN was lost due to the negligence of the rescue operation. More specifically, plaintiffs allege that the POINT LEDGE was not properly rigged for towing, that the Coast Guard abandoned the rescue after misleading Dreher to believe that further rescue efforts would be made, and that Lt. Williams acted imprudently in taking the BEVAN out of the Anchorage.

## THE POINT LEDGE

By the end of the trial plaintiffs' expert on rescue and salvage, John Walsh, concluded that the BEVAN was lost because the POINT LEDGE was not rigged for towing from amidship. Plaintiffs claim that an improperly rigged vessel is a basis for liability. Upon examining this issue the Court concludes that there is no obligation on the Coast Guard to outfit its vessels as plaintiffs would require. Therefore, there is no negligence per se due to the POINT LEDGE's rigging. Foltting v. Kaevando, 324 F.Supp. 585 (S.D.Tex. 1971); United States v. Sandra & Dennis Fishing, 372 F.2d 189 (1st Cir. 1967); Frank v. United States, 250 F.2d 178 (3rd Cir. 1957).

## ABANDONING THE RESCUE

Plaintiffs' second claim is that the Coast Guard improperly abandoned the rescue. The Court finds that on returning to the Noyo River, Lt. Williams told Mr. Dreher that further efforts would be made if possible. The testimony of many witnesses establishes that the weather did not improve but in fact got worse during the afternoon. In reviewing the conversation between Mr. Dreher and Lt. Williams, the Court concludes that it cannot reasonably be said that Mr. Dreher was being misled. The rescue was discontinued pending better weather which never arrived. Accordingly, no liability exists for the Coast Guard's failure to return to the BEVAN.

## THE TOWING OPERATION

Plaintiffs' primary claim is that the BEVAN was imprudently taken out of a relatively safe area into a treacherous ocean. Initially, the parties disagree on the proper standard to which the Coast Guard is held. The defendant claims that the Coast Guard was acting as a salvor and therefore more than mere negligence is required to establish liability. P. Dougherty Co. v. United States, 207 F.2d 626 (3rd Cir. 1953). However, the Court concludes that the

**1064**

correct standard is one of reasonable care under the circumstances as they appear to the man on the ground. United States v. Sandra & Dennis Fishing, *supra*; United States v. Gavagan, 280 F. 2d 319 (5th Cir. 1960) ; United States v. DeVane, 306 F.2d 182 (5th Cir. 1962).

Plaintiffs argue that the BEVAN should have been held in Area A for repairs or salvage. Plaintiffs' expert, John Walsh, contends that Area A was safe because it was protected from the direct ocean waves, it had a flat sandy bottom, and it was near the beach. Plaintiffs believe that the BEVAN could have been repaired while in Area A or at the least salvage from the flat sandy bottom would be possible at a small cost and with minimum damage. Furthermore, plaintiffs argue that by taking the BEVAN out to sea the Coast Guard was unreasonably placing the BEVAN and its crew in peril. As a direct result of the Coast Guard's imprudent decision, the BEVAN was lost.

The Court has found this issue of alleged negligence to be most difficult and perplexing. However, for the following reasons the Court concludes that there is no liability against the Coast Guard for its actions.

Lt. Williams testified that because the BEVAN was without steering he intended to turn the BEVAN around by towing it in a gradual semi-circle. In agreeing with Lt. Williams' choice of action Ray Welch testified that it would not be possible to turn the BEVAN inside the Anchorage. John Walsh testified that the BEVAN could have been turned inside the Anchorage. The Court concludes that Lt. Williams' choice, although possibly not the only choice, was a reasonable one. The Court is persuaded by Ray Welch's testimony that the safe channel through the Anchorage is narrow. Plaintiffs have contended that Area A and the deep channel together provided ample room for turning. However the Court finds convincing Ray Welch's description of the treacherous nature of Area A. Although some vessels may safely hold in

Area A, Lt. Williams was faced with a decision under very trying circumstances. The wind was very strong and there was significant wave action in Area A which might bottom the POINT LEDGE in the trough of a swell. Lt. Williams reasonably believed that it would be safer away from the surf and rocks albeit in larger waves outside the Anchorage. The Court further concludes that a reasonable man could conclude that Area A with its combination of shallow water and pounding surf was not suitable as a potential salvage area.

Alternatively, John Walsh testified that the BEVAN could have been held in Area A while repairs were made. However, Gevas and Wassenhove testified that they tried Mr. Walsh's suggestion of turning the rudder with a wrench and that it would not turn. And from the testimony the Court believes that due to the turbulence and due to the position of the hole that no patch could be made in that sea from inside the BEVAN. Therefore, realistically no repairs were possible on the BEVAN at sea.

Mr. Walsh also suggested that more pumps could have been placed on board or pumps from other vessels alongside could have been used. Yet, Ray Welch's unrefuted testimony was that the Coast Guard had the only floatable pump in the Fort Bragg area. Furthermore, John Figuerido's testimony is that the waves in the Anchorage made it impossible to come alongside the BEVAN. In dispelling another of plaintiffs' theories, Figuerido testified that he never would have attempted to tow the BEVAN in using the SEA VALLEY. Therefore, although there were many theoretical alternatives to what was done with the BEVAN, in reality most of those alternatives were non-existent due to the weather conditions in the Anchorage.

The Court concludes that Lt. Williams was faced with a decision under very trying conditions. He could not merely hold the BEVAN in the Anchorage because he had to get aid for his two crewmen who possibly had serious injuries. The BEVAN had to be turned and

Lt. Williams did not dare go into the rocky or shallow areas both north and south of the Anchorage's narrow safe channel. In light of this situation the Court cannot second guess Lt. Williams' decision to tow the BEVAN out to sea.

Finally, plaintiffs have attempted to put great significance on the fact that the SEA VALLEY was told to bring the BEVAN out to the POINT LEDGE. However, the Court does not believe this is determinative because Figuerido never intended to tow in the BEVAN. Lt. Williams' decision to keep the POINT LEDGE away from the jetties was reasonable. The force of the waves in the Anchorage, demonstrated by the injuries to the two crewmen, could have done serious damage to the POINT LEDGE by forcing it into the jetties or the rocks. Accordingly, the Court finds that Lt. Williams' action in having the SEA VALLEY tow the BEVAN out to the POINT LEDGE was a reasonable decision in furtherance of his plan to rescue the BEVAN as quickly and safely as possible.

Therefore, the case having been tried and the evidence having been heard, and counsel having presented their oral and written arguments, and the matter having been submitted, it is the conclusion of the Court that the evidence establishes that the Coast Guard was not negligent in the attempt to rescue the fishing boat BEVAN. The Court finds that the Coast Guard is not liable for the manner in which the POINT LEDGE was rigged or for engendering plaintiffs' reliance that further rescue efforts would be made. The Court further finds that the Coast Guard was not at fault for choosing to tow the BEVAN out to sea in an attempt to line it up for an approach into the Noyo River.

Judgment, therefore, will be for the United States of America, including costs of suit herein, and against plaintiffs Dreher, Gevas and Wassenhove. This memorandum will constitute findings of fact and conclusions of law for this case. Counsel for the defendant is directed to prepare a judgment in accordance herewith.