directors, shortly after the judge's order was rendered.

 Algeran's position that an automatic stay cannot be lifted so as to validate a sale made while the stay was in force, is without merit. Section 362(d) of Title 11 empowers the court to grant relief from the automatic stay by "terminating, annulling, modifying, or conditioning it." The district judge annulled the automatic stay as to the sale of AMI shares, as he was entitled to do under the statute and the facts of this case. With the automatic stay annulled, the sale that occurred cannot be said to be invalid. We find no reason or authority (and Algeran has produced nothing persuasive on this issue) prohibiting the nunc pro tunc effect of the order of annulment.

 Moving to the consolidated appeal of the Algeran trial attorneys we must ask, once again, if we have jurisdiction. And once again, we conclude that we do not. Their appeal from the sanctions order is an interlocutory one as the civil matter has not come to final judgment. Ordinarily, attorneys are permitted (as nonparties) to take an immediate appeal from sanctions orders. *Reygo Pacific Corp. v. Johnston Pump Co.,* 680 F.2d 647, 648 (9th Cir.1982). Parties, however, must await final judgment in order to appeal from such orders. *Johnny Pflocks, Inc. v. Firestone Tire & Rubber Co.,* 634 F.2d 1215, 1216 (9th Cir. 1980). Where, as here, the sanctions are imposed against both client and counsel, jointly, there is such a "congruence of interest" that the attorneys must await final judgment in order to appeal, and this is true even though they no longer represent the client. *Kordich v. Marine Clerks Ass'n,* 715 F.2d 1392, 1393 (9th Cir.1983).

The Algeran appeal (No. 84–5773) is moot and the attorneys' appeal (No. 84–5761) is from other than a final judgment. We dismiss both appeals for lack of appellate jurisdiction.[3]

---

**3.** The civil proceeding between Algeran and Advance Ross is still pending in district court. This opinion is not intended to express any view as to the merits of any of the parties' positions in that lawsuit. Similarly, this opinion is not intended, in any respect, to express any view as to the merits of the attorneys' appeal from the sanctions order.

Marilyn E. BERG, Personal Representative of the Estate of Ogie Berg, Plaintiff-Appellee,

v.

CHEVRON U.S.A., INCORPORATED, Defendant-Appellant.

No. 84–3935.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 4, 1985.

Decided May 9, 1985.

Edward & Barbieri, Malcolm L. Edwards, Howard M. Goodfriend, Catherine Wright Smith, Levinson, Friedman, Vhugen, Duggan, Bland & Horowitz, Harold F. Vhugen, C. Steven Fury, A. Richard Dykstra, Stafford, Frey & Mertel, Seattle, Wash., for plaintiff-appellee.

Helsell, Fetterman, Martin, Todd & Hokanson, Gary F. Linden, Thomas W. Huber, Karen J. Vanderlaan, Shannon M. Fitzpatrick, Seattle, Wash., for defendant-appellant.

Before WRIGHT, KENNEDY, and ANDERSON, Circuit Judges.

OPINION *

EUGENE A. WRIGHT, Circuit Judge:

This appeal arises from a claim of negligence brought by the estate of the owner of a vessel in distress against the vessel that attempted a rescue. We examine the standard of care owed by the rescuer and the findings made by the trial court. The sequence of events is significant and is set out in some detail.

FACTS

Ogie Berg was the master and part-owner of the CAPELLA, an 85-foot fishing vessel. The vessel sailed for King Cove, Alaska in March 1980. The crew consisted of Ogie Berg, Dagfin Berg, Jack Fink, Robert Connelly, and Scott Pickering. Dagfin Berg was at the helm. At 2300 hours on March 27, the vessel struck the rocks at Cape Lazaref, puncturing the stern lazarette and jamming the rudder.

The ALASKA STANDARD, owned by Chevron and with Captain Daily in command, sighted the distress signal of the CAPELLA at 0545 on March 28. The CAPELLA requested a tow from the ALASKA STANDARD. The tow, which began at 1000 hours, used the CAPELLA's anchor equipment.

During the tow, the ALASKA STANDARD asked at least three times by radio if the crew of the CAPELLA would like to come aboard. Each invitation was declined. Ogie Berg was asked once per hour whether his vessel was in danger of sinking. Each time he answered no.

The weather deteriorated during the tow. At 2300 hours, Captain Daily elected to anchor the ALASKA STANDARD off the Fox Island Anchorage until the storm abated. The wind was from the east at 50 knots, the seas were running 10 to 15 feet, and snow limited visibility to 50 yards. The CAPELLA remained in tow 700 feet behind the ALASKA STANDARD. Captain Berg was asked whether he wished the CAPELLA brought alongside or whether

---

* A companion case, *Evich v. Connelly*, 759 F.2d 1432, filed today, incorporates the facts herein.

he would put the crewmen aboard the ALASKA STANDARD. Again he declined, and he and the crew took to their bunks.

The CAPELLA had been taking on water through the puncture in the stern lazarette. Paper products had been stored in the lazarette and the bilge pump intake was clogged by them. No attempt was made to clean the intake or to request additional pumps from the ALASKA STANDARD.

At 0110 hours on March 29, the CAPELLA told Second Mate John Betz aboard the ALASKA STANDARD that all was in order. Ten minutes later, Ogie Berg radioed that the vessel was capsizing and that the crew was trapped in the wheelhouse. The vessel had actually turned on its side and it sank within moments. Its life raft was not deployed.

All five of the crew donned survival suits and jumped in the water without informing the ALASKA STANDARD. Captain Daily, who had been informed the crew was trapped inside the vessel, ordered the CAPELLA be pulled alongside.

The ALASKA STANDARD notified the Coast Guard of the situation at 0150 hours. The Coast Guard was informed that the ALASKA STANDARD could not conduct a search because of the storm conditions. The Coast Guard was unable to respond until 0630 hours.

Captain Daily was presented with a number of rescue options. The ALASKA STANDARD carried two lifeboats, two inflatable life rafts, and a number of lighted ring buoys. Some of the ALASKA STANDARD crewmen volunteered to take one of the lifeboats and attempt a rescue. Captain Daily rejected that option and later testified his decision was motivated by the dangers involved in launching in heavy seas, including capsizing or breaking up.

The chief mate suggested that one of the life rafts be put over the side unmanned and allowed to float back to the CAPELLA. Captain Daily refused and later explained that inflating the rafts would be too dangerous in the high winds and that he considered the effort futile because he believed the crew members were trapped in-

side the wheelhouse. The only possible alternative explanation for this conduct would be callous indifference on Captain Daily's part. This interpretation of the facts, however, is not supported by any credible evidence presented to the district court.

Finally, Captain Daily chose not to put the ring buoys in the water because he was concentrating on trying to maneuver the ALASKA STANDARD closer to the CAPELLA. The ALASKA STANDARD could not get underway because of the weather and the proximity of the nearby rocks. Instead, it attempted to pull the CAPELLA alongside but failed when the towing gear, supplied by the CAPELLA, parted.

Pickering tried to stay near the CAPELLA but was forced away by the wind and waves. At 0715 hours, Captain Daily sighted Pickering and two other persons on the beach at Fox Island. After waiting and waving from the beach, Pickering swam toward the ALASKA STANDARD at 1000 hours. The F/V PATHFINDER retrieved him and later retrieved the bodies of Ogie Berg, Dagfin Berg, Jack Fink, and Robert Connelly. All were wearing survival suits but had drowned.

Marilyn Berg sued Chevron in her capacity as personal representative of the Estate of Ogie Berg. The Estates of Fink and Connelly brought suit against Chevron and against the owners of the CAPELLA, Ogie Berg and Peter Evich. Both the owners of the CAPELLA and the ALASKA STANDARD sought exoneration and limitation of liability.

The Berg wrongful death action and the two exoneration suits came to trial before Judge Tanner. He found Chevron to be negligent in "one or more of the following ways":

(1) in failing to notify the Coast Guard of the distress of the CAPELLA in a timely fashion;

(2) in failing to anchor the ALASKA STANDARD with the CAPELLA in tow in the protected area of the Fox Island Anchorage before it sank;

(3) in failing to pull the CAPELLA closer to the ALASKA STANDARD after the vessels were at anchor;

(4) in failing to use the parachute flares on the ALASKA STANDARD to light the area after the CAPELLA capsized; ·

(5) in failing to launch the ring buoys or the inflatable life raft on the ALASKA STANDARD to assist the crew of the CAPELLA after it capsized;

(6) in failing to pull the CAPELLA closer to the ALASKA STANDARD after the CAPELLA capsized; and

(7) in failing to search for and assist the crew of the CAPELLA after it sank.

Judge Tanner found that Chevron's negligence was the proximate cause of Ogie Berg's death and that Captain Berg was not comparatively negligent. Chevron was denied limitation of liability because it violated the Salvage Act of 1912, 46 U.S.C. § 728, and the Federal Boat Safety Act of 1971, 46 U.S.C. § 1465(a). Berg's estate was awarded approximately $1,200,000.

DISCUSSION

1. *Standard of Care*

   a. *Negligence, Good Samaritan Test, or Rescue Standard?*

■ The proper standard of care is a legal question and can be reviewed de novo. *Miller v. United States*, 587 F.2d 991, 994–95 (9th Cir.1978); *Schenck v. Government of Guam*, 609 F.2d 387, 390 (9th Cir.1979).

The district court applied both a negligence and a culpable negligence standard. Chevron contends that only the culpable negligence standard should apply in maritime salvage and rescue cases. Berg counters that the maritime salvage standard does not apply in personal injury cases.

■ The law of admiralty has always sought to "encourage and induce men of the sea to go to the aid of life and property in distress." 3A M. Norris, *Benedict on Admiralty* § 234 (7th ed. 1980). Liberal salvage rewards have been established for saving property. Life salvors are entitled, under certain circumstances, to share in property salvage awards. *Id.* at § 24, 46

U.S.C. § 729. The maritime rescue doctrine has developed as an encouragement to life saving attempts.

Early cases applied a negligence standard to the rescue of seamen. *See, e.g., Hutchinson v. Dickie*, 162 F.2d 103, 106 (6th Cir.), *cert. denied*, 332 U.S. 830, 68 S.Ct. 208, 92 L.Ed. 404 (1947) (no negligence in a failed attempt to rescue a guest); *Harris v. Pennsylvania Railroad Co.*, 50 F.2d 866, 869 (4th Cir.1931) (question of negligence in rescue of seaman who fell overboard through his own negligence).

That standard was rejected in *Grigsby v. Coastal Marine Service of Texas, Inc.*, 412 F.2d 1011, 1021–22 (5th Cir.1969), *cert. dismissed*, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970). In noting the desire to encourage emergency rescues, *Grigsby* stated that "liability for negligent salvage is limited to situations in which the salvor, through want of due care, has worsened the position of the victim." 412 F.2d at 1021.

In *Patentas v. United States*, 687 F.2d 707, 714–15 (3d Cir.1982), the court applied the Restatement Good Samaritan test to determine governmental liability for negligent inspection. The Restatement provides that a Good Samaritan is liable "for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure ... increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking." Restatement (Second) of Torts § 323 (1965).

Finally, the Fourth Circuit examined the rescue standard of care in *Furka v. Great Lakes Dredge and Dock Co.*, 755 F.2d 1085 (4th Cir.1985). The court reversed a finding that a rescuer who drowned during the attempt was guilty of contributory negligence. Once the rescue attempt began, "there must be evidence of wanton or reckless behavior on [the rescuer's] part before any fault may be assigned. This is the standard traditionally applied to the conduct of plaintiffs in rescue situations." *Id.* at 1088.

■ We agree with *Grigsby, Patentas,* and *Furka,* and hold that the proper standard of care is that a rescuer will be held liable only (1) for negligent conduct that worsens the position of the victim or (2) for reckless and wanton conduct in performing the rescue.

### b. *Boating Safety Act*

■ Berg asserts that § 1465(a) of the Federal Boat Safety Act of 1971, 46 U.S.C. §§ 1451–89, provides the standard of care to be applied here.[1] Section 1465(a) states "[t]he operator of a vessel ... involved in a collision, accident, or other casualty, to the extent he can do so without serious danger to his own vessel, or persons aboard, shall render all practical and necessary assistance to persons affected ... to save them from danger caused by the collision, accident or casualty." This section does not apply because the ALASKA STANDARD was not involved in the CAPELLA's accident, the grounding at Cape Lazaref.

If any section of the Boating Safety Act were applicable, it would be section 1465(b).[2] That section provides that persons "who gratuitously and in good faith render assistance at the scene of a vessel collision, accident, or other casualty ... shall not be held liable for any civil damages as a result of the rendering of assistance ... where the assisting person acts as an ordinary, reasonably prudent man would have acted under the same or similar circumstances." Congress intended to "protect the 'Good Samaritan' who offers assistance." S.Rep. No. 92–248, 92d Cong., 1st Sess., *reprinted in* 1971 U.S.Code Cong. & Ad.News 1333, 1345. The section embodies the same standard of care that we have established above.

### 2. *Findings on Negligence, Proximate Cause and Comparative Negligence*

■ An admiralty court's findings on negligence, proximate cause and comparative negligence are reviewed under the clearly erroneous standard. *See Dillingham Tug & Barge Corp. v. Collier Carbon*

& *Chemical Corp.,* 707 F.2d 1086, 1092 (9th Cir.1983) (admiralty court's findings on issues of negligence reviewed under clearly erroneous standard), *cert. denied,* —— U.S. ——, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). The trial court found Chevron negligent in "one or more ... ways." The findings are set out above and are referred to here by number.

■ Finding 1 is ambiguous and clearly erroneous. If "distress" refers to the accident on the rocks and the flooding of the CAPELLA, the finding is clearly erroneous because Berg had an obligation to notify the Coast Guard if he thought the vessel was in danger. He continually reassured the ALASKA STANDARD that there was no danger. The rescue vessel knew of no distress of which the Coast Guard should be notified. If "distress" meant the capsizing, the finding is still clearly erroneous. The Coast Guard was notified within 30 minutes, but was unable to respond for six hours because of the weather. Even if it had been notified immediately, it could not have made the rescue.

■ Finding 2 is clearly erroneous. The anchorage selected by Captain Daily was calmer than the open seas. Berg agreed with the decision to anchor and with the location. There is some evidence in the record that the bay which Pickering floated into after swimming away from the sinking ship was calmer then the anchorage. There is no evidence in the record that the ships could have anchored there or that the bay was calmer when the anchorage was chosen.

■ Finding 3 is also clearly erroneous. The ALASKA STANDARD offered to bring the CAPELLA alongside or to bring the crew aboard. Berg declined the invitations. The uncontradicted evidence is that shortening the tow line from 700 feet to 150 feet would have presented a danger to both crews.

---

1. Section 1465(a) is now codified at 46 U.S.C. § 2303(a).

2. Section 1465(b) is now codified at 46 U.S.C. § 2303(c).

■ Finding 4 is unsupported by the record. Parachute flares are used for notifying passing vessels of emergencies. The only evidence of their use for lighting a rescue scene is the statement of an expert for Berg that "it's going to help their morale if nothing else."

■ Although closer, finding 5 is also erroneous. The ALASKA STANDARD could have thrown life rings over in the hope they would drift back to the CAPELLA. Even if Captain Daily erred in not casting them over, that was not the proximate cause of Berg's death. The chance of the life rings or raft reaching any of the crewmen was small and the ALASKA STANDARD was concentrating on other means of rescue. The finding on the inflatable life raft is clearly erroneous because the wind and sea conditions created a risk to the crew deploying the raft.

■ Finding 6 is contradicted by the record. The ALASKA STANDARD attempted to bring the CAPELLA closer after it capsized, but the tow line parted. It parted because the equipment provided by the CAPELLA snapped.

■ Finding 7 is also unsupported by the record. The ALASKA STANDARD did attempt to search for and assist the crew of the CAPELLA, but the danger to the rescuers prevented success. Both these findings misinterpret the rescue doctrine and assume that the rescuers must be successful to avoid a finding of negligence.

The finding that Chevron's negligence was the proximate cause of Berg's death is clearly erroneous. The only possible finding of negligence was the failure to throw life rings over the side. But that did not put the crew in any greater peril than they were already in.

■ Finally, the finding that Ogie Berg was not comparatively negligent is clearly erroneous. The relevant negligence of the person rescued is not that which causes the initial accident but rather that which, whether occurring before or after the accident, relates to the rescue and either worsens the victim's condition or hinders the rescue. The record is replete with such negligence by Berg. These include storing paper products in the lazarette, which clogged the bilge pumps and failing to get the pumps cleared or to request additional pumps. He also failed to notify the ALASKA STANDARD that the flooding was not under control.

Once the vessels were anchored, Berg declined the offers to put the crew aboard or to come alongside the ALASKA STANDARD. He had not instructed the crew in the use of survival suits or conducted any lifeboat drills. These actions demonstrate the clear error in the finding that Berg was not comparatively negligent.

We find the trial court's findings on negligence, proximate cause, and comparative negligence clearly erroneous. We need not reach the issue of whether Chevron was improperly denied limitation of liability because there is no liability to limit.

CONCLUSION

■ When factual findings are in error we usually remand to the trial court. A remand is not required when the record permits only one resolution of the factual disputes. *Pullman-Standard v. Swint,* 456 U.S. 273, 292, 102 S.Ct. 1781, 1791, 72 L.Ed.2d 66 (1982); *In re Southern States Motor Inns, Inc.,* 709 F.2d 647, 653 n. 11 (11th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984).

We conclude that the only resolution possible on this record is that the captain and crew of the ALASKA STANDARD were not negligent. The judgment against Chevron is vacated and the judgment is reversed.