**Jack WRIGHT, Scottsdale Insurance Company, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. C 84–5931 TEH.**

United States District Court, N.D. California.

Nov. 26, 1988.

John R. Hillsman, McGuinn, Hillsman and Palefsky, San Francisco, Cal., for plaintiff.

Peter K. Mitchell, Asst. U.S. Atty., San Francisco, Cal., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THELTON E. HENDERSON, District Judge.

This action in admiralty arises under the Public Vessels Act, 46 U.S.C.App. §§ 781 *et seq.* It concerns the sinking of F/V AXIS following collision with the United States Coast Guard vessel 41367 on August 23, 1983, on the high seas southwest of Point Sur, California. Having considered the testimony, exhibits, pre- and post-trial memoranda and argument of counsel, the Court makes the following findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. Plaintiff Jack Wright purchased the F/V AXIS in April, 1979 for $40,000. He thereafter made improvements in the approximate amount of $80,424.00.

2. Plaintiff Scottsdale Insurance Company (Scottsdale) carried the hull insurance on the AXIS.

3. The AXIS was a wooden fishing vessel, with a 1″ carvel planking, and was built in 1950. Carvel planking consists of hull planks laid lengthwise side-by-side over wood frames. A small "v" is located between the planks in which caulking is placed to make the hull watertight. All the planks are about six inches high. The planks near the keel are about ½ inch apart, and the remainder of the planks are about 5/16 inches apart.

4. In 1982 the AXIS was drydocked at Kettenburg Marine, San Diego, for repairs and for a survey as required by Scottsdale.

5. During the drydocking and survey Kettenburg observed worm damage, but the damaged plank was not replaced. Instead, it was repaired with a lead patch.

6. In August 1983 AXIS sailed north towards Oregon to fish for albacore. Her crew consisted of the skipper, Tom Wright, the owner's son, and two crewmen, Randy Basinger and Ronald Harden.

7. As the vessel passed Point Conception, the seas became markedly rougher.

8. On the night of August 11, 1983, the seas were 8 to 10 feet and the wind was 15 to 20 knots. AXIS was allowed to drift overnight with the engine running, while the crew slept, without maintaining a lookout, despite heavy seas. It is not clear whether there were navigational lights.

9. At approximately 5:30 a.m., August 23, 1983, the crew commenced fishing approximately 30 miles off Point Sur. The seas were still 8 to 10 feet, winds 15 to 20 knots, and sea spray covered AXIS' deck.

10. At approximately 9:00 a.m. Ronald Harden went below and heard water sloshing in the bilge. Until that time, there was no indication of water in the bilge.

11. He raised the floorboards and saw that there was water in the bilge area approximately 18 inches to 2 feet deep, or only 1″ below the floorboards. AXIS' bilge alarm did not sound as it had been turned off.

12. Harden immediately ran and informed the skipper of the water and asked him to call the Coast Guard for assistance.

13. The operator of the vessel, Thomas Wright, informed Group Monterey that his vessel was taking on water, had a distress situation, and requested assistance. Ralph Frias of the Coast Guard, maintained communication with the AXIS over an extended period of time. At first the voice from the AXIS was calm, then became hysterical, and finally stating the following: "Jesus Christ Coast Guard, get the hell out here, we're going down."

14. The crew checked the overboard discharges for the bilge pumps and found that no water was being pumped over the side. They discovered that debris was clogging the intake strainers, but even after the debris had been removed, the pumps did not discharge a full stream of water.

15. AXIS' crew was able to locate a breach in the hull through which water was entering. It was approximately 1″ wide, at least 14–18″ long, and on the garboard strake just forward of the engine. The actual total length of the gap was unknown since it extended under a "vee-berth."

16. While waiting for Coast Guard assistance, Basinger attempted to plug the breach with chisels wrapped with oakum but the worm-eaten strake was too weak to hold the "plugs" and approximately half went completely through the breach and were lost.

17. In response to the call for assistance, Coast Guard Group Monterey [Group Monterey], which was approximately 38 miles from AXIS, diverted a Coast Guard helicopter which happened to be on a training mission in the area and it delivered two portable gasoline pumps, P–140 pumps, to the scene at approximately 9:52 a.m. At the same time, a 41–foot Coast Guard Utility Boat, The 41367 ("The 67") was dispatched from Monterey.

18. At approximately 9:54 a.m. the helicopter lowered a P–140 pump to AXIS. At 10:07 a.m. it commenced operating; however, AXIS' crew indicated that it was not keeping up with the flooding, and the pump ran intermittently throughout the incident.

19. At 10:10 a.m. the helicopter lowered the second P–140 pump. The second pump could not be started as it was soaked with sea water which was constantly spraying on deck. The crew's failure to read the operating instructions contributed to their inability to start the pump.

20. Shortly thereafter the helicopter crew informed AXIS that her life raft had broken away. AXIS immediately reversed course to retrieve it.

21. At approximately 10:55 a.m. the first pump stopped working as it was shorted out by sea water.

22. After the helicopter delivered the P–140 pumps, the AXIS' bilge pumps again became clogged and worthless.

23. As the water level inside AXIS' hull continued to rise, AXIS' skipper was constantly on the radio asking Group Monte-

rey when the utility boat would arrive on scene, and stating AXIS was going down. His voice and messages progressively indicated increased concern and alarm.

24. In the meantime, at 9:12 a.m., or only four minutes after the call for assistance, Group Monterey dispatched a 41' utility boat, CG–41367, which had a P–140 pump and an eductor aboard. However, due to the distance to AXIS, she was not able to arrive on scene for approximately 2 hours.

25. At approximately 10:55 a.m. the coxswain of CG–41367 heard AXIS' skipper talking on the radio to Group Monterey. Prior to that time he had only been able to hear Group Monterey. Although still not able to directly communicate with AXIS, he was informed AXIS' crew felt things looked bad and AXIS was going down.

26. At approximately 11:10 a.m. CG–41367 established direct contact with AXIS. The skipper stated AXIS had five to six feet of water in her bilges; needed additional pumps and assistance in operating the portable pumps which the Coast Guard helicopter had delivered; and that AXIS could not keep up with the flow of water.

27. Shortly thereafter the coxswain spotted AXIS. She was low in the water, listing 10 to 15 degrees to port, and wallowing. This indicated she was in danger of capsizing.

28. CG–41367 arrived on scene at approximately 11:15 a.m. The Coast Guardsmen rigged at least four fenders over CG–41367's port side and AXIS' crew rigged at least two fenders over her starboard side. CG–41367 then approached AXIS' starboard side.

29. Two Coast Guard seamen jumped on board AXIS. Other Coast Guardsmen passed a P–140 pump and an eductor to them, and within three minutes the eductor was in operation followed shortly thereafter by the P–140 pump. Despite their operation, the water continued to rise.

30. After the P–140 and eductor were operating, the coxswain tied CG–41367 to AXIS. However, as the seas were rough, and as they were in the trough, the vessels jolted each other a couple of times.

31. The coxswain unsuccessfully attempted to turn AXIS into the seas. Accordingly, he cast off the mooring lines and maneuvered CG–41367 to take a position approximately 20 to 40 feet off AXIS' starboard beam. This allowed the Coast Guard to keep the eductor running without interruption.

32. The Coast Guardsmen were able to start one of the P–140 pumps which the helicopter had delivered, but it only ran for a few minutes. The second pump, which had been dismantled by AXIS' crew, would not start. After the incident, both pumps were dried and started without incident at Group Monterey.

33. After the coxswain was sure the eductor was running smoothly, he maneuvered CG–41367 close to AXIS so that his engineer could board her and identify the source of the flooding. He could only locate one source of flooding—the hole found by Basinger which was approximately 1″ wide and at least 14–18″ long. However, only approximately 30 percent of the planks were accessible for inspection.

34. Benneche believed there was another source of flooding as he felt the pumps could overpump the water entering through the breach he had located.

35. Benneche told an AXIS crewmember that it looked hopeless and the crewmember agreed.

36. Benneche gave the AXIS crewmember—the one who was attempting to plug the breach—the damage control kit and then he returned to CG–41367.

37. He told the coxswain that, in his opinion, AXIS could not be saved.

38. After Benneche reported back on board CG–41367, the coxswain approached AXIS. However, she was thrown into contact with AXIS and broke AXIS' starboard rub-rail. However, this did not affect AXIS' watertightness.

39. Meanwhile, Basinger drove 2x4 wedges into the breach. In doing so, he forced the garboard plank to come loose from its fasteners and a gaping hole was

**494**

created. This eliminated all possibility of salving AXIS.

40. At 11:40 a.m. AXIS' skipper told the coxswain that a plank had come off; the situation was hopeless; and that they were abandoning ship. This was at least the third time the skipper had stated that AXIS should be abandoned.

41. The crew gathered some of AXIS' gear—including the VHF radio, loran receiver, and binoculars—as well as personal effects.

42. At 12:20 p.m. the Coast Guard ceased pumping operations and removed its equipment from AXIS.

43. At approximately 12:50 p.m. AXIS capsized but did not sink.

44. Two days later, the Coast Guard conferred with the owner, and he said he had no interest in towing AXIS into port. As AXIS was a hazard to navigation, the owner gave the Coast Guard permission to sink her. The Guard Cutter sank AXIS as a hazard to navigation.

45. The Coast Guard exercised due care in its attempt to save AXIS. It was not negligent, did not worsen the position of plaintiffs, and was not wanton or reckless in its attempt to rescue AXIS.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter of this action pursuant to the provisions of the Public Vessels Act, 46 U.S.C.App. §§ 781–790, incorporating by reference the consistent provisions of the Suits in Admiralty Act. 46 U.S.C.App. §§ 741–752.

2. Under the Public Vessels Act, a party has no greater right against the United States than he would have against a private person under similar circumstances. *Canadian Aviator, Ltd. v. United States*, 324 U.S. 215, 228, 65 S.Ct. 639, 646, 89 L.Ed. 901 (1945).

3. A private party has no affirmative duty to rescue a vessel or person in distress. *Basic Boats, Inc. v. United States*, 352 F.Supp. 44, 48 (E.D.Va.1972); *Lacey v. United States*, 98 F.Supp. 219,

220 (D.Mass.1951); *see Frank v. United States*, 250 F.2d 178, 180 (3rd Cir.1957).

4. Likewise, the Coast Guard has no affirmative duty to render aid to a vessel or person in distress. *Daley v. United States*, 499 F.Supp. 1005, 1009 (D.Mass. 1980); *Shupe v. United States*, 1979 A.M.C. 2282, 2285 (C.D.Cal.1979) [Not otherwise reported]; *In re Weeks Dredging and Contracting, Inc.*, 1975 A.M.C. 1189, 1200 (E.D.Va.1975) [Not otherwise reported]; *Hansen v. United States*, 1953 A.M.C. 1581, 1584 (D.Or.1953) [Not otherwise reported].

5. If the Coast Guard responds to a call for assistance, it is not required to provide any particular kind of equipment or man, rig, or equip its vessels in any particular way. *Frank, supra; United States v. Sandra & Dennis Fishing Corp.*, 372 F.2d 189, 197 (1st Cir.1967), *cert. denied*, 389 U.S. 836, 88 S.Ct. 48, 19 L.Ed.2d 98 (1967); *Foltting v. United States*, 324 F.Supp. 585 (S.D.Tex.1971).

6. The Coast Guard is not held to any higher standard of care in its rescue operations than a private person. *Basic Boats, supra; Petition of United States*, 216 F.Supp. 775, 782 (D.Or.1963); *Lacey, supra.*

7. "Of all the branches of jurisprudence, the admiralty must be the most hospitable to the impulses of man and law to save life and limb and property." *Grigsby v. Coastal Marine Service of Texas, Inc.*, 412 F.2d 1011, 1021 (5th Cir.1969), *cert. denied*, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970).

8. Accordingly, a rescuer will be liable for damages only if (1) it was negligent and its conduct worsened the position of the vessel to be saved; or (2) it was reckless and wanton in its attempt to rescue the vessel. *Berg v. Chevron, U.S.A., Inc.*, 759 F.2d 1425, 1429 (9th Cir.1985); *Furka v. Great Lakes Dredge & Dock, Inc.*, 755 F.2d 1085, 1089 (4th Cir.1985). Neither of these conclusions may be reached under the facts herein.

■ 9. In applying the standards, the Court will not second guess the decisions made by rescue personnel in the midst of the rescue attempt. *Page v. United States*, 105 F.Supp. 99, 102 (E.D.La.1952); *Gause v. Kiffe*, 1972 A.M.C. 1928 (W.D.La. 1972) [Not otherwise reported]; *see Johnson v. United States*, 378 F.2d 732 (9th Cir.1967); *Furka, supra.*

■ 10. The standard of care exhibited by the rescuers is measured by the unique circumstances of the rescue. *Dreher v. United States*, 375 F.Supp. 1061 (N.D.Cal. 1972); *Page, supra.*

■ 11. Acts which could amount to negligence under other circumstances will ordinarily be found non-negligent when rescue operations are being carried out. *Johnson v. United States*, 378 F.2d 732 (9th Cir.1967); *see Michelmore v. United States*, 299 F.Supp. 1116 (C.D.Cal.1969).

12. Plaintiffs have failed to sustain their burden of proof.

13. Accordingly, judgment will be entered dismissing plaintiffs' action against the United States with prejudice and costs.

14. Any Conclusions of Law which constitute Findings of Fact and Findings of Fact which constitute Conclusions of Law shall be considered as having been determined accordingly.