Diane G. FONDOW, as Administratrix of the Estate of Jeffrey Hutchins, Plaintiff,

v.

UNITED STATES of America, Defendant.

Jeanne Lane and Eleanor Lowther, Co–Administratrices of the Estate of John Michael Lowther, Plaintiff,

v.

United States of America, Defendant.

Nos. CIV. A. 98–10251–PBS, 98–11814–PBS.

United States District Court, D. Massachusetts.

Aug. 28, 2000.

---

3. *But see* note 1, *supra.*

Peter J. Black, Meehan, Boyle & Cohen, P.C., Leo V. Boyle, Meehan, Boyle & Cohen, P.C., Boston, MA, for Diane G. Fondow, Plaintiff.

Debra J. Kossow, U.S. Dept. of Justice, Torts Branch, Civil Division, Stephen R. Campbell, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, for USA, Defendant.

Matthew A. Kamholtz, Segal & Feinberg, Matthew H. Feinberg, Feinberg & Kamholtz, Boston, MA, for Jeanne Lane, Patricia Lowther, Plaintiffs.

## MEMORANDUM AND ORDER

SARIS, District Judge.

## I. INTRODUCTION

On September 5, 1996, on a tranquil morning at 5:15 a.m., a barge being towed by a tugboat collided with a tuna boat, the F/V HEATHER LYNNE II. The boat capsized, trapping three crew members inside the turtled hull in an air bubble for almost two hours. In a race against time, the United States Coast Guard and several valiant individuals unsuccessfully attempted to rescue them. They drowned just as divers were arriving on the scene to extricate them.

Invoking the Court's admiralty and maritime jurisdiction pursuant to the Suits in Admiralty Act, 46 U.S.C.App. § 741 *et seq.*, the estates of two of the deceased fishermen filed this wrongful death action [1] against the United States alleging that the Coast Guard's negligence worsened the situation and caused the deaths. Specifically, plaintiffs allege that the Coast Guard was negligent in: failing to convey the urgency of the situation in its radio broadcast; failing to get divers to the scene sooner; not attempting to stabilize the boat while waiting for the divers to arrive; lowering the divers from a helicopter too close to the capsized vessel; and discouraging, and even obstructing, other would-be rescuers and divers. The United States takes the position that plaintiffs have not met their burden under the Good Samaritan doctrine.

The Court held a non-jury trial that was limited to the issue of liability from April 25 through May 4, 2000. After hearing testimony and reviewing the exhibits, the Court orders entry of judgment for the defendant.

---

1. The estates of the crew members also filed a wrongful death action against the owners of the ESSEX and the HOUMA, and an action against the HEATHER LYNNE. Each case has been settled.

## II. FINDINGS OF FACT

### A. Collision

In the early morning hours of September 5, 1996, the tugboat HOUMA was towing a barge, the ESSEX, in the vicinity of Jeffrey's Ledge, which is approximately eight nautical miles ("nm")[2] off the coast of Cape Ann, Massachusetts. The barge was approximately 500 yards behind the tug. The F/V HEATHER LYNNE II ("HEATHER LYNNE"), a forty-two foot fiberglass boat, was also in the area. At approximately 5:15 a.m., the ESSEX collided with the HEATHER LYNNE, which was probably anchored.[3] The HEATHER LYNNE went under the barge and then re-emerged upside down, with all three crew members trapped inside. The HOUMA reported the collision to the Coast Guard Station in Gloucester, Massachusetts ("Station Gloucester") at 5:19 a.m. over VHF channel 16.[4] The collision occurred before sunrise,[5] and neither the HOUMA's crew nor the ESSEX's crew could see the vessel with which they collided. Although it was overcast, the seas were a flat calm. When morning broke, there were three to four miles of visibility.

### B. May Day

As soon as Station Gloucester received the distress call, the personnel on duty began to implement a Search and Rescue ("SAR") plan. Petty Officer Second Class Kevin Angerstein was the senior person on duty at Station Gloucester. One of his first actions was to notify Coast Guard Group Boston, Massachusetts ("Group Boston"), which was organizationally superior to Station Gloucester.[6] That morning, Petty Officer First Class Richard Barone[7] was assigned as Group Boston's Duty Officer.[8] Both Barone and Angerstein had SAR experience and were formally trained on SAR procedures, as well as the guidelines in the National Search and Rescue Manual ("National SAR Manual") and the Coast Guard Addendum to the National SAR Manual ("Addendum").[9]

At 5:22 a.m., Barone assumed the duties of the SAR Mission Coordinator and took charge of allocating SAR resources and directing Coast Guard assets. One of his first actions was to contact the Coast Guard's district headquarters to request assistance from a helicopter. The district duty officer assigned a helicopter to the mission from the Coast Guard Air Station Cape Cod ("ASCC"), which was the nearest air station. Barone directed the helicopter to proceed to the scene and to search for survivors who might be drifting in the water. He also instructed Station Gloucester to send one of its boats to the

2. A nautical mile is about 2,000 yards. It is longer than a statute mile, which is 1,760 yards.

3. An administrative law judge found the tugboat operator at fault for failing to use all available lesources to assess the risk of collision and for maintaining an imprudent course and speed while knowingly transiting through a concentration of fishing vessels. Pursuant to a consent order, the judge took action against his merchant mariner's license.

4. Channel 16 is the designated emergency channel that most mariners monitor.

5. The sun did not rise that day until 6:10 a.m.

6. The Coast Guard's shore organization begins with individual Coast Guard stations. Those stations report to a Group Commander. Group Commanders report to a District Commander. All Stations in this case are part of Group Boston, which is part of the First Coast Guard District.

7. Barone has since been promoted to Chief Petty Officer.

8. Petty Officer Barone had undergone SAR training in order to become qualified to stand watch as the Group Duty Officer. He has attended the Coast Guard's SAR school and has completed numerous SAR related correspondence courses. He also received on-the-job training and passed an oral examination.

9. The National SAR Manual provides general guidance to all federal agencies that participate in civil SAR missions. The Addendum complements the national manual with guidance tailored to Coast Guard operations.

collision scene to be the Coast Guard's "eyes and ears" and to assist as necessary.

At 5:23 a.m., Station Gloucester dispatched its forty-one foot boat ("CG–41").[10] The boat's maximum speed was 26 knots.[11] Petty Officer Third Class Christian Smith, was the senior person on CG–41. He had been involved in numerous SAR missions, but had only received limited amounts of formal SAR training. There were three other personnel onboard, all of whom were qualified surface swimmers. That qualification allows them to enter the water to perform limited rescues. Surface swimmers may not go underwater· to enter a capsized boat. *See* U.S. Coast Guard Addendum to the National SAR Manual § 6.C.1 ("[A] Coast Guard Swimmer is NOT to go under the water and enter a capsized or submerged object.") [hereinafter Addendum]; *id.* § 4.I.2.a ("[S]urface swimmers shall not enter a capsized or submerged object.").

## C. *SCOTIA II*

Early that morning, the F/V SCOTIA BOAT II ("SCOTIA II"), a forty-two foot fishing boat, was anchored approximately 1500 yards south of the accident site. Her crew was asleep in their bunks when the HEATHER LYNNE and the ESSEX collided. The noise from the collision woke the boat's captain, Richard Burgess. He immediately went to the wheelhouse and heard the HOUMA calling Station Gloucester for help. Burgess aroused the crew, released the anchor, and went to the scene to render assistance.

The SCOTIA II arrived on scene at approximately 5:24 a.m., and joined the HOUMA in the search for survivors. Bur-

gess began his search at the tug and then slowly proceeded on a course parallel to the tow line. His mate, Steven Smith, used a handheld searchlight to look for survivors in the darkened waters. Within a few minutes Burgess made his way to the barge, which was moving through a debris field. At approximately 5:33 a.m., Burgess saw the bottom of a hull emerge from underneath the barge. The vessel came to the surface in an inverted "turtled" position. As Burgess approached the overturned vessel at 5:34 a.m., he heard Station Gloucester advise the HOUMA that a helicopter was en route.[12] (In fact, because of poor weather conditions at ASCC, the helicopter would not take off until 5:50 a.m.)

Burgess quickly identified the vessel as the HEATHER LYNNE. He maneuvered his boat alongside the overturned hull and Smith used the butt end of a gaff[13] to tap on the hull in an attempt to determine whether any people were trapped inside. When Smith tapped the part of the hull that corresponded to the boat's galley, he heard people respond by banging against the inside of the hull. He also heard voices yelling for help. There was more than one person alive and trapped inside the boat. At 5:36 a.m., Burgess relayed this information to Station Gloucester and asked the Coast Guard to bring divers to the scene. Moments later, Station Gloucester responded saying that they were looking for divers.

## D. *Divers*

Station Gloucester maintained a list of civilian divers who were available to pro-

---

10. The boat had various rescue equipment on board, including: a dewatering pump; a tow line; miscellaneous small boat lines; life jackets; a life raft; and surface swimmer equipment (i.e. mask, fins, and a snorkel).

11. A knot is a unit of speed equal to one nautical mile per hour. One knot is roughly equivalent to 1.2 statute miles per hour.

12. Group Boston recorded all radio transmissions made over VHF channels 6, 9, 12, 16, 22, and 81. A transcript of those transmissions, together with the transmission time, was entered into evidence. However, the transcript does not indicate which channel was recorded for a given transmission.

13. A gaff is a long galvanized pole with a sharpened hook at one end. It is often used to lift large fish onto a boat.

vide rescue services for SAR operations.[14] Angerstein directed Petty Officer Berassa to contact the rescue team from the Beverly, Massachusetts Fire Department (the "Beverly Divers"). He chose the Beverly Divers because they were the closest rescue divers to Station Gloucester, and also they were one of two organizations that advertised twenty-four hour service. The team is made up of four groups with three divers in each group. They had received limited training with the Coast Guard, but were not trained in helicopter operations. Generally, at least one group is on duty, but response times can vary because the team members are often on duty at different fire stations.[15] Berassa contacted the Beverly Fire Department's dispatcher at 5:37 a.m., and requested the dive team's assistance. The dispatcher agreed to provide the divers, but could not give an estimated time of arrival.

While Berassa was talking to the dispatcher, Barone called Angerstein to discuss locating divers. Once Barone learned that Station Gloucester had already contacted the Beverly Divers, he stopped looking for other divers.[16] While on the phone with Barone, Angerstein turned away momentarily to speak with Berassa who was again talking to the Beverly dispatcher two minutes later.[17] Recognizing the need for alacrity, Angerstein was heard telling Berassa, "I can get ten divers out there? I don't need ten. I need as many as I can get right now, not tomorrow morning, like right now." The Coast Guard still did not have an estimated time of arrival.

After contacting the Beverly Divers, no Coast Guard personnel ever attempted to determine whether any other diver(s) could respond sooner. Both Angerstein and Barone believed the Beverly Divers were the best available diving resource because they were specially trained rescue divers, they operated as a team, and their proximity to Station Gloucester made it likely that they would be able to respond sooner than other teams. Neither duty officer considered looking for divers in the vicinity of ASCC.

At 5:54 a.m., the Beverly dispatcher called Station Gloucester to say that at least two divers would arrive at the station within fifteen or twenty minutes. When Angerstein received the information, he was on another phone line with Barone, and passed it on immediately. He said: "Anyway two divers in fifteen minutes and [then] I'm outta here."[18] (Pl. Exh. 19, at 8.)

### E. UMIB

At 5:37 a.m., Group Boston transmitted its first Urgent Marine Information Broadcast ("UMIB") on VHF channel 16. The message stated:

Hello all stations, this is the United States Coast Guard Boston, Massachusetts Group .... The Coast Guard has received a report of a vessel capsized in position 42 41 decimal 75 north, 070 22 decimal 4 degrees west approximately 10 nautical miles off Cape Ann. All vessels are requested to keep a sharp look-

14. The rescue divers on the list included a private organization as well as teams from the Beverly, Quincy, Salem, and Marblehead Fire Departments. Only Beverly and Salem were listed as offering 24 hour service. The list also included several diving services that specialize in commercial salvage.

15. The team members have taken on their diving responsibilities in addition to their normal fire-fighting duties.

16. Barone had a list of divers, but it was not very comprehensive. After the incident, Group

Boston updated the list. To find alternative divers would have required Barone to call people out of the phone book.

17. Group Boston recorded all incoming and outgoing phone calls during this operation. The tapes were transcribed and entered into evidence.

18. Angerstein planned on taking the divers to the scene in one of Station Gloucester's boats as soon as they arrived.

out, assist if possible and report all sightings to any Coast Guard unit. . . . (Pl. Exh. 4, at 13.) The message was drafted by a junior watchstander based on a standard format. It was repeated every fifteen minutes throughout the rescue operation, but was never updated with additional information. Several vessels learned of the collision from the UMIB and came to the scene. One of those vessels was the F/V RETRIEVER, which was operated by the HEATHER LYNNE's owner, Thadeus Rurak.

### F. Stabilizing the HEATHER LYNNE

At 5:45 a.m., Burgess reported to the Coast Guard that the HEATHER LYNNE's bow was sinking. Barone asked Burgess, "Is there any way you can tie on [to the HEATHER LYNNE] without jeopardizing [her] stability . . . ?" (Pl. Exh. 19, at 7.) Burgess discussed the situation with the HOUMA, and they decided that the tug would tie on to the capsized vessel because its size would lend the greatest support. The HOUMA positioned herself alongside the HEATHER LYNNE facing the opposite direction so that her starboard side touched the overturned vessel's side. Once the tugboat was in position, it passed a heavy nylon line to the RETRIEVER, which had backed up against the HEATHER LYNNE's stern. Rurak climbed onto the overturned hull and attached the line around the HEATHER LYNNE's skeg.[19]

Barone considered directing the vessels to secure additional lines to the capsized vessel, but he decided not to because he did not want to risk upsetting the boat and disturbing the air pocket. However, Barone never told anyone not to attach additional lines to the vessel.

### G. The Helicopter

At approximately 5:50 a.m., a Coast Guard HH–60 Jayhawk helicopter took off from ASCC. It was commanded by Lieutenant Commander Craig Lindsey. The helicopter took longer than expected to lift off because of a thick fog that reduced the visibility to the minimum allowable for emergency missions. At the time, it was not certain how many people were onboard the HEATHER LYNNE before the collision, or how many people were trapped inside the hull.[20] Therefore, the helicopter was given the task of searching the area around the vessel for survivors who might be drifting in the water.[21] Lindsey was told that people were trapped inside the hull when he was approximately two to five minutes away from the scene. No one at ASCC attempted to locate divers to bring to the scene. The helicopter had a rescue swimmer on board. At 6:12 a.m., the helicopter reported to Group Boston that it was fifteen minutes from the location of the accident.

### H. Sea Tow

By 6:03 a.m., Station Gloucester had learned that Sea Tow, a commercial salvor operating out of Newburyport, Massachusetts, was en route to the scene with a diver, Jay Lesinski. To get to the scene, the Sea Tow boat had to travel several miles down the Merrimack River, which is northwest of the scene of the accident, before getting to the Atlantic. The total distance to the collision site was approximately twenty-three nm. The Sea Tow boat's maximum speed was twenty knots. At full speed, it would have taken the boat

**19.** A skeg is a fin-like extension of a boat's keel that provides greater stability in heavy seas. It also supports the lower end of the rudder post.

**20.** In fact, no one was certain how many people were originally onboard until several minutes after the victims were recovered. After the third victim was recovered, the owner,

Rurak, asked the divers to submerge again to make sure there was not a fourth person onboard.

**21.** Because of its speed, maneuverability, and height of eye, a helicopter is a much better search platform than surface vessels.

one hour and nine minutes to get to the collision site.

Angerstein relayed the Sea Tow information to Barone, and they discussed several options to help Lesinski get to the scene more quickly. The first option was to send a twenty-one foot Rigid Hull Inflatable Boat ("RHIB")[22] from Coast Guard Station Merrimack ("Station Merrimack") to pick him up. Merrimack's RHIB has a maximum speed of thirty-four knots. RHIBs do not have a cabin area, leaving their passengers exposed to the elements. Also, at high speeds, these boats ride rough and have a tendency to become airborne as they pass over swells. This creates a risk that a passenger or equipment might fall over the side of the boat. The second possibility was for Angerstein to pick up Lesinski in Station Gloucester's forty-seven foot boat, which is six to eight knots faster than Sea Tow's boat. A third option would have been to use Station Gloucester's twenty-four foot RHIB to pick up the diver. That boat's maximum reasonable speed is roughly fifty miles per hour.

Although any of these options would have considerably reduced Lesinski's transit time, each option also had a drawback. They felt that, even though the sea conditions were calm that morning, the twenty-three nm trip was too long to safely transport Lesinski in a RHIB. Also, at that point, they planned to use Station Gloucester's forty-seven foot boat to transport the Beverly Divers to the scene. Based on the dangers associated with this rescue, Barone strongly preferred using a team of trained rescue divers. After discussing these options, Barone and Angerstein decided not to send any Coast Guard asset to help Lesinski get to the scene, instead letting the Sea Tow boat continue on its own.

## I. CG–41

CG–41 was the first Coast Guard unit to arrive at the scene. By the time the boat arrived at 6:10 a.m., several fishing vessels had gathered around the HEATHER LYNNE. Smith was concerned that the newly arriving boats might bump into the overturned vessel or disturb her with their wakes, in either case jeopardizing the vessel's stability and the integrity of the air pocket. As a precaution, he directed newcomers to back away, and he established a forty to fifty foot security zone around the HEATHER LYNNE. In the security zone, Smith was able to prevent a passerby's wake from reaching the HEATHER LYNNE by moving between the wake's path and the capsized hull. Also, throughout the rescue and recovery, none of those boats informed the Coast Guard that it wanted to enter the zone to provide assistance. The HOUMA remained tied to the overturned hull. When Smith arrived, he noticed that the HEATHER LYNNE was listing slightly to her starboard side. Otherwise, she stayed relatively stable until he eventually left to pick up the divers. Smith made no efforts to secure the HEATHER LYNNE's bow.

Captain Robert Yeomans of the F/V ERICA LEE, a commercial tuna charter vessel, arrived at the scene sometime before 6:30 a.m. Yeomans was a third class boatswain mate in the Coast Guard from 1966 to 1970 and has some SAR experience. In fact, he had been assigned to Station Gloucester. Yeomans was fishing approximately eight nm east of the scene when he heard about the collision on the radio. Although he could not recall the exact time he arrived at the scene, Yeomans remembers seeing a Coast Guard helicopter circling overheard and then flying off to the west. Yeomans planned on coming alongside the HEATHER LYNNE to see what he could do to help. But, before he could get close to the vessel, a man on the tug (either the mate or the skipper) waved him off, telling him "the Coast Guard is going to take care of this

---

**22.** The term RHIB comes from the boat's design. It has a fiberglass hull which is surrounded by an inflated pontoon. RHIBs are powered by an outboard motor.

case, the Coast Guard is involved, wait for the Coast Guard." (Tr. 3–13.) Two other boats were trying to come close as well. The person who waved him off was not a member of the Coast Guard.

Yeomans anchored fifty yards away from the scene. He testified that had he been allowed to come along side the HEATHER LYNNE, he would have tried to stabilize her bow by securing it to his boat. However, Yeomans never said he explained his intentions to the Coast Guard.

### J. *Muniz*

At some point, Burgess, of the SCOTIA II, radioed the tuna fleet and asked for help. He told them that the HEATHER LYNNE had capsized and that her crew was trapped inside the vessel. Burgess asked whether any listener had diving gear onboard. Also, at approximately 6:15 a.m., Burgess called William Muniz, who was operating the F/V SCOTIA BOAT ("SCOTIA I"),[23] on a semiprivate phone line to discuss the accident and the need for divers. Muniz was already aware of the situation from listening to his radio. At the time, Muniz was in the process of gathering one of his fishing nets and was approximately twenty nm from the scene. He is a qualified sport diver and had one set of diving gear on board. Also, one of his crew, Dwayne Rine, was an experienced commercial diver.

The SCOTIA I's maximum speed is only twelve knots. Muniz estimates that it would have taken him almost two hours to respond to the scene. However, when he heard the call, Muniz was fishing with another boat, the LADY JANE. The LADY JANE is a thirty-five foot skiff with two outboard motors. Her maximum speed is thirty-five knots. Had Muniz gone to the scene in the LADY JANE, at full speed, he would have arrived in just over thirty-four minutes. The Coast Guard did not specifically ask Muniz to

respond, but he did hear the UMIB's general request for assistance. He was also aware from the other radio transmissions and his conversations with Burgess that men were trapped inside the hull and that divers were necessary to get them out.

Muniz decided not to respond because he did not think the HEATHER LYNNE would stay afloat long enough for him to get to the scene; and he thought the Coast Guard was in control and was providing divers. However, he explained that his predominant reason for not responding was that he thought the boat would sink quickly. Muniz has been on two boats that sank within ten to fifteen minutes after capsizing. Based on those experiences, he estimated the odds of the HEATHER LYNNE staying afloat long enough for him to render assistance were a "million to one." (Tr. 3–110.) When asked whether he would have gone to the scene had the Coast Guard not been involved in obtaining divers, Muniz answered, "If I thought the boat was going to last that long, we would have already been there." (*Id.* at 111.)

### K. *Goodridge*

At some point during Yeomans' transit to the scene, he used a cellular phone to call Michael Goodridge, who operates a commercial diving and salvage business under the name Marine Services/TowBoat U.S., and asked for his assistance. Goodridge has worked with several Coast Guard units before. He was one of the salvors to whom Stations Gloucester and Merrimack often referred distress calls. In addition, he has performed various maintenance related diving services on Coast Guard cutters and boats.

Goodridge estimates that he received Yeomans' call sometime between 6:10 a.m. and 6:20 a.m. As soon as he learned of the situation, Goodridge raced to his boat, which he docks in the Merrimack River, approximately 200 yards from Station

---

**23.** Muniz bought SCOTIA I from Burgess.

Merrimack, and got underway. The Merrimack River empties into the Atlantic roughly two nm east of Goodridge's dock. The maximum speed of his boat is between twenty-three and twenty-eight knots, depending on sea conditions. Shortly after getting underway, Goodridge called the Coast Guard to tell them he was proceeding to the scene. The Coast Guard acknowledged his call, but did not offer him any additional assistance. Goodridge made a general request (to no avail) on VHF channel 16 for help in getting to the scene from any vessel in the area that could travel in excess of thirty knots. However, he did not specifically ask the Coast Guard for help.

Goodridge learned that the Sea Tow was bringing a diver to the scene. He eventually rendezvoused with the Sea Tow boat just outside the mouth of the Merrimack. Since Goodridge's boat was faster than Sea Tow's boat, Lesinki climbed onto Goodridge's boat, and they proceeded to the scene at full speed.

### L. *The Elusive Scalloper*

Several witnesses recalled hearing a radio transmission from a scallop boat,[24] offering to come to the scene and use its winch to hoist the HEATHER LYNNE onto its stern ramp.[25] However, an unidentified station told the scallop boat that its assistance was not necessary because the Coast Guard was providing divers.

It is uncertain where the scallop boat was when it offered to help. John Cyr, who was fishing near the collision site on the F/V JAN–ANN, believed the scallop boat was twenty nm from the scene. (Tr. 3–87.) Another witness, Michael Leary, who was twenty-two nm northeast of the

accident on the F/V MEGHAN & RYAN, has no present memory of its location. However, nearly one month after the incident, Leary gave a written statement in connection with a suit against the owner of the tugboat, stating that the scallop boat was only four nm from the scene. He stands by the accuracy of his statement.[26] However, he acknowledged on cross-examination that he may have learned of the offer from other fishermen after the incident.

Leary's statement is also the only evidence that specifically identifies the Coast Guard as having declined the offer. Other witnesses could not recall exactly who turned down the offer, but they assumed it was the Coast Guard. None of the Coast Guard witnesses recalled hearing the assistance offer, and each emphatically denied turning it down.

It is also uncertain when the scallop boat offered to help, as no witness can recall the time they heard the transmission. Muniz gave a very rough estimate, testifying that he heard the offer sometime in "the middle" of the incident. The only possible reference to the scallop boat in the radio transcript was a broken transmission from an unknown station that was recorded at 6:39 a.m. It said, "I don't know. He offered to put cables ... (unclear)." (Pl. Exh 4 at 47.) The scallop boat would have had cables. If the scalloper made the offer at 6:39 a.m., it was too late to be of any use because the boat began to list at 6:40 a.m., the last report of knocking was 6:47 a.m., and the boat rolled at 6:54 a.m.

### M. *Transporting the Divers*

At 6:23 a.m., the helicopter arrived on scene and orbited the area several times

---

24. Vessels that fish for scallops are much larger than tuna boats. They are usually in excess of 100 feet long and have powerful winches and a gated stern that allows them to pull large objects onto their deck.

25. Although this transmission is not reflected in the radio transcript, that does not mean that it did not occur. Transmissions made

beyond VHF range of Group Boston were not recorded.

26. "I heard a scallop boat which was 4 miles from the scene tell somebody that their boat could hoist the entire boat (Heather Lynne) up its ramp. I heard the Coast Guard tell them not to touch the boat and that the divers were on their way."

looking for survivors. Finding none, the pilot, Lindsey, called Group Boston and offered to transport the divers to the scene. At 6:28 a.m., the helicopter headed towards Station Gloucester.

The Beverly Divers began to arrive at Station Gloucester at approximately 6:23 a.m. The first member of the team to arrive was its leader, Robert Atherton. Other members of the team and the equipment truck arrived a few minutes later. A Coast Guard representative met Atherton outside the station's headquarters to brief him with the information known at the time. He was told that victims were possibly trapped inside a capsized hull.

Atherton was given two options to get to the scene—a helicopter and Station Gloucester's forty-seven foot boat ("CG–47"). Because the space available on the helicopter was limited, Atherton directed most of the divers to go on CG–47 and he decided to go on the helicopter with two others. Before leaving, the team gathered equipment and held a safety briefing. CG–47 left the dock between 6:30 a.m. and 6:35 a.m. The remaining divers gathered their equipment and walked to the helipad, which was thirty to forty feet from the boat dock. The helicopter touched down at 6:36 a.m. The divers strapped themselves in, and the helicopter lifted off sometime between 6:40 and 6:42 a.m. The divers were not ready to board the helicopter immediately when Lindsey landed. Had he arrived sooner, he would not have been able to take off any earlier.

While the helicopter was picking up the divers, the HEATHER LYNNE became increasingly unstable. At 6:40 a.m., the HOUMA observed that she was beginning to list to her starboard side. Seven minutes later, the tug made a similar report. At 6:47 a.m., bystanders heard the trapped crew members knocking against the hull. This is the last reported knocking. Each

time the boat moved, onlookers could see air bubble out from the hull.

The helicopter returned to the scene at 6:50 a.m. The flight crew and the divers decided to offload the divers by lowering them in a basket to CG–41. Lindsey directed CG–41 to move away from the collision site before the transfer began. He did so because it is safer to lower passengers to a moving vessel than a stationary vessel, and he was concerned that if he flew too close to the HEATHER LYNNE, the helicopter's rotor wash might disturb her.[27] At approximately 6:53 a.m., the helicopter began to lower the divers to CG–41. When the operation began, both units were approximately one quarter to one half nm from the HEATHER LYNNE and moving steadily away from the collision site. They completed the transfer at approximately 6:59 a.m., at which time they were approximately an additional quarter nm away from the scene. The tugboat was between the helicopter and the HEATHER LYNNE during the transfer. Also, Smith observed that, throughout the operation, the HEATHER LYNNE remained outside the ring of waves created by the helicopter's rotor wash. The rotor wash did not cause the HEATHER LYNNE to roll and lose the air pocket.

N. *Tragedy*

While the divers were being lowered, things took a dramatic turn for the worse for the trapped crewmen. At 6:53 a.m., the HEATHER LYNNE rolled sharply and came to rest on her starboard side. The roll caused the remaining air in the hull to rush up to the surface of the water. The banging from inside the hull had stopped.

Once the divers were aboard, CG–41 headed back to the scene at full throttle. At Atherton's request, Smith pulled alongside the HOUMA. The dive team used the tug to survey the overturned vessel

27. The winds generated by helicopter rotors can reach speeds up to 150 knots. A helicopter's rotor wash has the capacity to flip a car.

and determined that her bow had to be stabilized before it was safe for the divers to attempt to enter the hull. Atherton entered the water at 7:06 a.m. and found the HEATHER LYNNE's bowline, which was submerged eight to ten feet beneath the surface of the water. He grabbed the line and passed it to his tender, who secured the line to one of the tug's cleats.

Once the HEATHER LYNNE was secured, Atherton and his partner submerged to look for victims. They discovered a tear in the vessel's forecastle that allowed them to look into the galley area, where they saw two people, Jeffrey Hutchins and John Lowther. Neither showed any sign of life. Atherton's partner recovered Lowther and brought him to the surface at 7:13.

As Lowther was being transferred onto one of the waiting boats, Goodridge and Lesinski arrived. Smith saw them donning their diving gear and told them not to enter the water because the Beverly Divers had the situation under control. Goodridge did not hear Smith and dove in to assist in the recovery. Goodridge brought Jeffrey Hutchins to the surface at 7:20. Atherton found Kevin Foster in the boat's wheelhouse and brought him to the surface at 7:26 a.m. He also appeared lifeless.

The three victims were hoisted onto the helicopter and transported to Boston City Hospital. They were given cardiopulmonary resuscitation throughout the transit. However, the efforts to revive them were unsuccessful. All three were pronounced dead at the hospital.

## III. CONCLUSIONS OF LAW [28]

### A. The Good Samaritan Doctrine

■ The applicable statutory authority for the Coast Guard's search and rescue operations states that:

(a) In order to render aid to distressed persons, vessels, and aircraft on and under the high seas and on and under the waters over which the United States has jurisdiction and in order to render aid to persons and property imperiled by flood, the Coast Guard may:

(1) perform any and all acts necessary to rescue and aid persons and protect and save property;

\*    \*    \*    \*    \*    \*

(b)(1) . . . [T]he Coast Guard may render aid to persons and protect and save property at any time and at any place at which Coast Guard facilities and personnel are available and can be effectively utilized.

14 U.S.C. § 88.

■ Although one of the Coast Guard's statutory missions is to provide rescue services to mariners in distress, it is under no obligation "to provide rescue services on demand." *United States v. Sandra & Dennis Fishing Corp.*, 372 F.2d 189, 195 (1st Cir.1967). The decision to render assistance is discretionary. *See United States v. Gavagan*, 280 F.2d 319, 328 (5th Cir.1960); *Hood v. United States*, 695 F.Supp. 237, 242 (E.D.La.1988).

■ Like any other volunteer rescuer, the Coast Guard owes a good Samaritan duty of care when it promises to launch a rescue. *See Indian Towing Co. v. United*

---

**28.** The parties agree that the Court has jurisdiction over this wrongful death action pursuant to the Suits in Admiralty Act ("SIAA"), 46 U.S.C.App. § 742 (stating that a proceeding in admiralty can be brought against the United States if it could be brought against a private person in similar circumstances). In enacting this provision, Congress "intended to bring all admiralty claims against the United States within the ambit of the SIAA, whether or not involving cargoes and vessels." *Kelly v. United States*, 531 F.2d 1144, 1149 (2d Cir.1976) (reaffirming, in a wrongful death action against the Coast Guard involving a rescue, the traditional rule that where the negligent act originates on land and the danger occurs on water, the cause of action is within the admiralty jurisdiction as long as the acts and omissions "significantly relate to maritime activity"). The SIAA is the exclusive remedy against the United States for maritime torts. *See Patentas v. United States*, 687 F.2d 707, 713 (3rd Cir.1982).

*States,* 350 U.S. 61, 63, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (holding, in a case involving the Coast Guard's negligent maintenance of a lighthouse, that "it is hornbook tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner").

■ The First Circuit has held that "[w]hatever may be the limits of this principle with respect to volunteered salvage," once the Coast Guard decides to undertake a mission, it must conduct the operation with "acceptable seamanship." *Sandra & Dennis Fishing Corp.,* 372 F.2d at 197 (upholding a finding that a Coast Guard officer's negligent failure to check the loran on the fishing vessel he was towing, after the loran on his own boat failed to operate properly, caused the deaths of several of the fishing vessel's crew members who perished when their vessel was towed onto a shoal); *accord United States v. DeVane,* 306 F.2d 182, 186 (5th Cir.1962) ("But having undertaken the rescue and engendered reliance thereon, the obligation arose to use reasonable care in carrying out the rescue").

■ "[T]he Good Samaritan rule does not impose liability for merely negligent failure to confer a benefit, but only for negligently making matters worse." *Rodrigue v. United States,* 968 F.2d 1430, 1434 (1st Cir.1992) (rejecting a claim that the Air Force violated the Good Samaritan Rule when it negligently waited four hours to send a helicopter to rescue a drowning swimmer because there was no evidence that the negligence worsened his position, but suggesting that such a claim would fly if there was evidence that the Air Force had assured other would-be rescuers of an imminent rescue); *see DeVane,* 306 F.2d at 186 (holding that the worsening test was met where a fateful error of a Coast Guard message center lulled a would-be rescuer into believing a fishing vessel was safe).

The Restatement (Second) of Torts § 323 (1965) provides:

One who undertakes, gratuitously or for consideration to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if:

(a) his failure to exercise such care increases the risk of harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

The Restatement thus recognized two ways a rescuer can make a situation worse. The first is by increasing the risk of harm to the person in peril. *See, e.g., Sandra & Dennis Fishing Corp.,* 372 F.2d at 195 (towing an otherwise safe fishing vessel onto a shoal where it sank); *Patentas,* 687 F.2d at 716 (following the Restatement comment that "increased risk" means some physical change to the environment or some material alteration of circumstances) (quoting Restatement § 324A(a), Comment C, Illustration 1); *Miller v. United States,* 614 F.Supp. 948, 951–52, 955 (D.Me.1985) (finding the United States liable for attempting to rescue a disabled sailboat by bringing it alongside a six hundred foot Navy ship, which rolled on top of the sailboat, splintering the boat and causing it to sink).

The second way a rescuer might worsen a situation is by inducing reliance on the rescuer's efforts. *See* Restatement § 323(b). Courts have imposed liability when the Coast Guard's actions caused potential rescuers to " 'rest on their oars' ... in reliance on the Coast Guard's undertaking and its presumed, unless affirmatively disclaimed, competency." *Daley v. United States,* 499 F.Supp. 1005, 1010 (D.Mass.1980) (quoting *Lacey v. United States,* 98 F.Supp. 219, 220 (D.Mass.1951)); *see Sandra & Dennis Fishing Corp.,* 372 F.2d at 195 ("[T]he government must not mislead, and induce reliance upon a belief that it is providing something which, in fact, it is not providing."); *Gavagan,* 280

F.2d at 328–29 (holding that the Coast Guard's failure to pass on vital information caused would-be rescuers to stand by in reliance on the Coast Guard's "celebrated skill").

Defendant's duty of care under the Good Samaritan Rule is consistent with admiralty law's policy of encouraging mariners to rescue those in distress. *See Berg v. Chevron U.S.A.,* 759 F.2d 1425, 1429 (9th Cir.1985) ("The law of admiralty has always sought to 'encourage and induce men of the sea to go to the aid of life and property in distress.'") (quoting 3A M. Norris, Benedict on Admiralty § 234 (7th ed.1980)).

■ The Court must consider the Coast Guard's actions and decisions in the dawn light of the information known during the rescue and not under the bright light cast by nearly four years of hindsight. *See Korpi v. United States,* 961 F.Supp. 1335, 1347 (N.D.Cal.1997) ("A rescue attempt must be considered in the light of the circumstances that faced the rescuers when they acted and not with the wisdom of an 'armchair admiral' after the fact."); *Wright v. United States,* 700 F.Supp. 490, 495 (N.D.Cal.1988) ("The standard of care exhibited by the rescuers is measured by the unique circumstances of the rescue."); *Hood,* 695 F.Supp. at 244 ("[T]he Court will not second guess the decisions made by rescue personnel in the midst of the rescue attempt."). Therefore, conduct that might ordinarily be negligent may be non-negligent in the pressure cooker circumstances of a rescue. *See Korpi,* 961 F.Supp. at 1347; *Wright,* 700 F.Supp. at 495.

Plaintiffs contend that the standard of care is set forth in the National SAR Manual and the Addendum. They emphasize the general caveat that:

SAR planning is both an art and a science, relying greatly on the creativity and experience of the personnel involved. Because of the many variables encountered during SAR operations and the individuality of each SAR case, the guidance in this manual must be tempered with sound judgement, having due regard for the individual situation. Nothing in this Manual should be construed as relieving SAR Personnel of the need for initiative and sound judgment.

I Joint Chiefs of Staff & U.S. Coast Guard, National Search and Rescue Manual v, § 3.a (1991).

Although the manual requires SAR personnel to exercise "sound judgment," this directive should not be construed as abrogating the Good Samaritan Doctrine. *See In re American Oil Co.,* 417 F.2d 164, 170 (5th Cir.1969) ("The SAR Plan imposes no extra statutory pre-existing legal duty on the Coast Guard."); *Daley,* 499 F.Supp. at 1010 (stating that the National SAR manual and the Addendum "do not define a standard of care owing to the public"); Addendum, *supra,* at 2 ("The Coast Guard retains the discretion to deviate from … this guidance without notice. This document creates no duties, standard of care, or obligations to the public and should not be relied upon as a representation by the Coast Guard as to the manner of proper performance in any particular case."). While a failure to comply with either manual is relevant to an evaluation of whether the Coast Guard acted with reasonable care in its rescue efforts, it is not dispositive. *Cf. Doe v. United States,* 718 F.2d 1039, 1041 (11th Cir.1983) (holding that a postal employee's violations of internal customer safety regulations do not constitute negligence per se).

### B. Negligence Claims

■ Plaintiffs argue that the Coast Guard committed numerous operational errors which worsened the situation and caused the death of the HEATHER LYNNE's crew. I will address each separately.

### 1. Coast Guard Communications

Plaintiffs have launched a multi-pronged attack on the Coast Guard's communica-

tions, claiming that they were inaccurate and inadequate, and that they actually discouraged would-be rescuers.

### a. *UMIB*

Plaintiffs claim that the UMIB failed to communicate the urgency of the situation, that is, the fact that members of the crew were alive and trapped in the boat and that divers were needed. If this information had been broadcast, they argue, other potential rescuers in the area would have responded. The Coast Guard points out that the UMIB, which was broadcast at 5:37 a.m. and repeated every fifteen minutes thereafter, reported a capsized vessel and requested vessels "to assist if possible." (Pl. Exh. 4, at 13.)

While it is true that the UMIB was based on a standard format, and was not updated with more current information, anyone listening to the UMIB would have been alerted to the urgency of the situation by monitoring other radio communications. Indeed, the radio transcripts of six of the channels that can be (and were) readily monitored by the fishing vessels (especially channel 16) highlighted the emergency: that there were survivors trapped inside the hull and that an underwater recovery team was needed as soon as possible. Also, Burgess put out a request for divers over channel 10, which is the channel the fishing vessels use to communicate with each other. Certainly, Goodridge and Sea Tow understood that time was of the essence, as they were hastening down the Merrimack River. Any deficiency in a lackluster UMIB was more than cured by the dramatic radio broadcasts regarding the dire race against time.

### b. *Muniz*

Plaintiffs contend that Muniz (who had diving gear) would have hustled to the accident scene if the Coast Guard had recruited divers. In hindsight, it is likely that Muniz could have made it to the scene in time to have attempted a rescue before HEATHER LYNNE's fatal roll at 6:53

a.m. However, his own testimony establishes that the Coast Guard's involvement did not influence his decision not to respond. On direct, he testified his *primary* reason for not responding was that he thought his efforts would be futile. Muniz has been on two sinking boats, and each went down within ten to fifteen minutes of capsizing. At a minimum, it would have taken him thirty minutes to get to the scene. He estimated that the odds of the vessel remaining afloat that long were "a million to one." (Tr. 3–110.)

Also, the failure of the UMIB to reference the specific need for divers could not have been a factor in Muniz's decision, because he was acutely aware of the need for divers from other radio transmissions and his conversations with Burgess. I, therefore, find that Muniz's forbearance was induced by long odds and not reliance on the Coast Guard's involvement.

### c. *Misinformation*

Plaintiffs allege that the "misinformation" that the Coast Guard was in the process of transporting divers to the scene and that it had a helicopter "en route" prevented the earlier arrival of these divers and worsened the position of the crew of the HEATHER LYNNE. At 5:34 a.m. (and again at 5:43 a.m.) the Coast Guard did make a misstatement that the helicopter was en route. In fact, it did not leave until 5:50 a.m. because of fog in Cape Cod. Plaintiffs appear to rely on the following portion of the transcript to support their argument that the Coast Guard misled the fishing vessels into believing that divers were on the helicopter:

> [5:35.52] "Yeah, is the vessel coming here going to have uh, divers on Board?"

> [5:36:01] "Houma station negative the uh, Helo (unreadable) over."

(Pl. Exh. 4, at 11.) Moments later it was emphasized that the HEATHER LYNNE's bow was in the water and her stern was "coming up." The Coast Guard responded via the radio: "Scotia Boat II

Station Gloucester, I understand, be advised we gonna call some divers." (Pl. Exh. 4, at 12.) Whatever the "unreadable" portion contained, the Coast Guard communication, heard in its totality, could not have left the misimpression that the helicopter or CG–41 was bringing divers to the scene.

### d. *The Elusive Scalloper*

Next, plaintiffs assert that the Coast Guard discouraged a nearby scalloper from coming to assist. However, there is little evidence to support plaintiffs' contention that the scallop boat could have successfully rescued the crew. In making their claim, plaintiffs rely heavily on Leary's statement that, "I heard a scallop boat which was 4 miles from the scene tell somebody that their boat could hoist the entire boat (Heather Lynne) up its ramp. I heard the Coast Guard tell them not to touch the boat and that the divers were on their way." (Pl.Exh. 20.) Unfortunately, Leary has almost no present memory of the details of the offer.

Plaintiffs moved the statement into evidence, and the government objected on hearsay grounds. I overruled the objection and admitted the statement as a recorded recollection. *See* Fed.R.Evid. 803(5). Although the statement was made twenty-eight days after the incident, Leary testified that the matter was still fresh in his mind when he gave it. Also, he lined out several errors and initialed his changes, indicating that he put some thought into the statement. Finally, on redirect examination, he testified that he stands by the accuracy of the statement.

Although I admitted the statement, I give it very little weight. On cross-examination, Leary acknowledged that he may not have heard the scallop boat's offer first hand and may have learned of it from other fishermen after the incident. Also, plaintiffs have not offered any evidence to

corroborate Leary's statement. In fact, John Cyr, who also testified for plaintiffs, contradicts Leary. Cyr testified that the scallop boat was twenty nm from the scene. (Tr. 3–87.) Also, although several witnesses recalled hearing the scallop boat's offer, only Leary specifically identified the Coast Guard as having declined the offer.[29] Finally, every Coast Guard witness emphatically denied refusing any assistance offers.

Even if the Coast Guard declined the scalloper's offer, plaintiffs' claim fails because there is no evidence establishing the time the scalloper offered to help. To rescue the fishermen, the boat would have had to arrive at the scene before the HEATHER LYNNE started listing at 6:47 a.m., and rolled at 6:53 a.m. Leary, who has served on several scallop boats, testified that their maximum speed is generally no more than nine knots. Therefore, even if the boat was only four nm away when it offered to help, it would have taken at least twenty-six minutes to get to the scene. Also, once the boat arrived, it would have presumably required several more minutes to set up its equipment and to attach its cables to HEATHER LYNNE. Under this time-line, the scallop boat would have had to offer help no later than 6:25 a.m. There is no evidence to support such a finding.

I, therefore, conclude that plaintiffs have not carried their burden of proving that the scallop boat was a would-be rescuer which would have been successful or that the Coast Guard induced the scallop boat's forbearance.

### e. *Yeomans*

Plaintiffs argue that the position of the crew was worsened by the Coast Guard's explicit instruction preventing Yeomans from tying his vessel to the bow of the HEATHER LYNNE to stabilize it. The fatal flaw in this argument is that one of

---

**29.** Several other witnesses testified that they "assumed" the Coast Guard declined the scal- lop boat's offer.

the tug's crew, not the Coast Guard, waved Yeomans away from the scene. Also, Yeomans never testified that he told anyone that he wanted to stabilize the bow. His failure to do so significantly undercuts plaintiffs' claim that Yeomans would have changed the outcome of the rescue.

### 2. *Stabilizing the Boat*

The more serious argument, and perhaps the most troubling one in the case, is the challenge to the Coast Guard's decision not to stabilize HEATHER LYNNE's bow while waiting for the divers to arrive. The bow line was eight to ten feet below the water, and floating free. Recall that the midship to stern of the boat had been stabilized but that the bow was reported as sinking. Why didn't a surface swimmer grab the bow line and secure it to the tug?

Plaintiffs introduced the testimony of Captain Adrian L. Lonsdale, who is a retired (and venerable) Coast Guard Captain and has master's papers in the United States Merchant Marine. He was a SAR controller in 1956, and was in the Coast Guard from 1950 to 1979. He attended the Coast Guard's SAR school in 1966 and 1975. Lonsdale has not published any rescue manuals or articles regarding capsized boats, although he writes recreationally about ship wrecks and sea tales. He has no personal experience with overturned vessels. However, he was involved (but not on scene) in a rescue operation where a Coast Guard boat stabilized "a fairly good-sized" sailboat that was sinking in an upright position by passing lines under the sailboat's hull to another Coast Guard boat, and taking a strain on the lines. He has had no additional SAR experience since he left the Coast Guard.

Captain Lonsdale believed that the Coast Guard erred by not stabilizing the vessel. According to Lonsdale, CG–41 should have been placed along the other side of the HEATHER LYNNE, and it should have passed lines, chains or cables under the bow section to the tug, and if possible, under the stern section as well; and put as much strain as possible on the lines with a capstan or a winch so that the capsized vessel could be lifted up a foot or two to prevent it from sinking and to prevent the air from escaping. Although Lonsdale did not disagree with the idea of establishing a buffer zone to stop wakes from affecting stability, he concluded that the Coast Guard could have accomplished this objective by issuing warnings over the radio.

The defendant's expert, Commander Robert S. Walters, is the director of the National Search and Rescue School in Yorktown, Virginia. He has been involved in numerous SAR operations since he joined the Coast Guard in 1976. Walters is experienced in operations with capsized boats, but he has never encountered one with people trapped inside. While he believed Petty Officer Smith acted prudently, he didn't say much about stabilizing the vessel.

Smith explained why he didn't try to stabilize the bow. He is a second class boatswain mate with no formal SAR training. This was the first time he had ever dealt with a capsized vessel with people trapped inside. Smith believed that the three inch line securing the HEATHER LYNNE was sufficient to prevent the boat from going down. Because the boat appeared to be very secure, he was not worried that the bow was not stabilized. Also, he didn't want to take a chance of tying a line to the boat and pulling too much. He was concerned that anything he did would jeopardize the boat's stability, and create, in his words, a "yo-yo effect." Put another way, he feared that if he tilted the boat in the slightest way port or starboard, he would have lost the air bubble. He also had the problem that he knew he would have to leave the scene to pick up the divers from the helicopter. Smith did not instruct anyone on the fishing vessels or tug not to tie to the bow area, and no one nearby (i.e., Burgess, the boat owner or the tug) took that initiative or even suggested it.

The remarkable thing about this case is that no one who testified—not Lonsdale, not Walters, and certainly not Smith—had ever dealt with a capsized boat with survivors inside. The consensus among the witnesses is that the vessel was stable until CG–41 left to pick up the divers. Smith's decision not to risk rocking the boat when it seemed stable was not unreasonable in light of the circumstances he confronted. As the First Circuit recognized in *Sandra & Dennis Fishing Corp.*, this Court must distinguish between "true negligence and hard choices under pressure." 372 F.2d at 197 n. 16.

### 3. *Procuring Divers*

The plaintiffs also argue that the Coast Guard was negligent for relying solely upon divers from the Beverly Fire Department when it had access to divers from numerous other locations. Barone admitted that he did not call any other dive teams because his list was very brief, and he would have had to call directory assistance or use the yellow pages to ask for dive teams in the communities between the scene and Cape Cod. He viewed that as unrealistic, and chose to rely on Station Gloucester. The SAR manual requires the Coast Guard stations to have a list of diving SAR resources available. *See* Addendum § 1.I.2 ("[A]dditionally, operational commanders shall ensure they have 24–hour contact numbers for DOD, state, county, municipal, volunteer and commercial SAR resources in their [areas of responsibility], including hospitals, ambulances, and coroners.").

Although I agree with plaintiffs that it was negligent for Group Boston not to have a comprehensive list of rescue divers, plaintiffs did not prove that this negligence caused any injuries or worsened the situation for two reasons. First, Station Gloucester had its own adequate list of divers and chose the Beverly Dive Team because

it had rescue experience and was closest to the accident scene. That was not negligent, but was sound judgment. *See id.* § 6.C.2 ("Divers can be used to assist in rescuing persons trapped under a capsized vessel. Many state and local agencies have dive teams."). Second, plaintiffs did not demonstrate that there were any other dive teams in the vicinity of ASCC, Logan Airport, or anywhere else en route that could have arrived more quickly on the helicopter than the Beverly Dive Team.

Next, plaintiffs argue that the Coast Guard should have called the commercial salvors right away. The Addendum permits the use of certified commercial divers, particularly well established ones like Goodridge who had rescue training experience. *See id.* However, as soon as Station Gloucester received confirmation that the Beverly Dive Team was available, it was reasonable to rely on the Beverly Dive Team because it had immediately available divers who knew how to work as a team, and was an entity the Coast Guard was familiar with. Even plaintiffs' expert agreed that the Beverly Dive Team was a "sure thing," but he would have continued calling as a failsafe.

In retrospect, it was troublesome that the Beverly Dive Team, which was contacted at 5:37 a.m., did not begin to arrive until 6:23 a.m. In a race against time, that delay turned out to be critical.[30] At approximately 5:54 a.m., the Beverly Dispatcher informed Station Gloucester that two members of the dive team would arrive within fifteen or twenty minutes. That estimate turned out to be slightly optimistic because it took twenty-nine minutes for the team to arrive. Perhaps Barone and Angerstein were too sanguine in their reliance on one dive team, and a perfect SAR operation would have had them searching for back-ups.

However, the standard is reasonableness, not perfection, and the courts have

---

**30.** I do not fault the Beverly Dive Team, who acted with celerity, but a more accurate estimated time from the dispatcher would have crystallized the Coast Guard's decision making.

cautioned against second guessing. Moreover, there is no evidence that the other listed, trained, twenty-four hour emergency rescue team could have arrived at Station Gloucester or at the accident scene more quickly.

One of the most hotly disputed issues was whether the Coast Guard was negligent in failing to provide transportation to Goodridge and Sea Tow. At 6:05 a.m., Barone and Angerstein debated their options involving Sea Tow. They knew that Sea Tow was twenty-three nm away from the scene and it would take one hour for Lesinski to get to the scene. Alternatively, Station Merrimack could have picked him up on their twenty-one foot RHIB, which can reach speeds up to thirty to forty miles per hour, depending on sea conditions; or, Angerstein could have picked him up on Station Gloucester's twenty-four foot RHIB, which can reach speeds in excess of sixty miles per hour.

Within minutes of this debate, the Coast Guard learned that Goodridge was also en route. Lesinski and Goodridge rendezvoused at about 6:25 to 6:30 a.m. at the mouth of the Merrimack River. Goodridge, after a series of mathematical calculations, testified that he and Lesinski could have reached the scene of the accident at 6:54 a.m., if Angerstein had taken the twenty-four foot RHIB, proceeded up the Annisquam River, and intercepted Sea Tow en route, driving sixty miles per hour. (Tr. 5–53; Pl. Exh. 2A). These estimates are questionable because: Angerstein believed that the boat could only be safely operated at fifty miles per hour; Goodridge miscalculated the location of the accident; and the estimate did not include the five minutes or so that it would have taken Lesinski and Goodridge to combine forces. Even if Angerstein had taken the RHIB upriver at fifty miles per hour, HEATHER LYNNE rolled at 6:53 a.m., and it is extremely unlikely that the divers would have been on scene and in the water in time to save the trapped fishermen.

Given what Angerstein knew early that morning, I find that he exercised reasonable care in his decision not to take the RHIB upriver. He was expecting the Beverly Divers any minute, and he was the only one at Station Gloucester who had the authority to drive the RHIB and CG–47. Although off-duty station members were certified to drive the boats, there is no solid indication as to how long it would take them to get to the station and be briefed.

In any event, even if Angerstein erred in making the judgment call that he should just let the Sea Tow boat "keep trucking" (an unfortunate use of words), (Pl. Exh. 17, at 9.), while he waited for the Beverly Dive Team, he did not worsen the situation for the accident victims because the Coast Guard in no way impeded or discouraged the divers from getting to the scene as quickly as possible.

As a penultimate argument, plaintiffs posit that the Coast Guard erred by not directing the helicopter to go directly to Station Gloucester to pick up the divers. However, Barone did not know exactly when the divers would arrive; and thought that there might be survivors in the water. He knew that the helicopter had a rescue swimmer (who was more trained than the surface swimmers aboard CG–41) and would also be the best search platform to locate any survivors. Therefore, initially it was not unreasonable to direct the helicopter to the accident scene.

The Coast Guard is to be faulted because the communications between the helicopter and Group Boston were so poor, as Barone readily acknowledged. These communications were the weak link in this SAR mission. Barone was not informed that the helicopter was delayed due to fog. At 6:12 a.m., Barone learned that the helicopter was still fifteen minutes away from the accident. At that point, he knew the Beverly Divers would be there momentarily and he should have diverted the helicopter. At the very least, he should have been updating Lindsey about the status of

the rescue. Lindsey (who is as sharp as a tack) would likely have figured out immediately that he should shift course. However, even if the helicopter had been directed earlier to shift routes to Station Gloucester, Atherton, the head of the Beverly Dive Team, stated that the divers were ready and assembled just within minutes of the helicopter arriving. Lindsey agreed, stating that some of the divers were still arriving when he landed. Therefore, an early diversion would not have made a material difference in the timetable for arriving at the accident scene.

Finally, plaintiffs argue that Angerstein was negligent by not transporting the Beverly Divers in his twenty-four foot RHIB, which went safely at fifty miles per hour. This trip would have taken about twenty-five to thirty minutes. Angerstein testified that he did not use the RHIB because it was an unsafe staging platform for the divers and it had a very limited communication system. Because some divers were ready at 6:29 a.m., their arrival time might have been between 6:54 and 6:59 a.m. The last report of knocking was at 6:47 a.m. and the boat rolled at 6:53 a.m. As the sand was running out, perhaps Angerstein erred in not taking the RHIB, even if it were not an ideal rescue vehicle. Whether it would have made a difference is too close to call.

### 4. *Failure to Sustain Life While Waiting for Divers*

Plaintiffs contend that the Coast Guard negligently caused the crew's deaths by failing to take appropriate measures to sustain their lives until the divers arrived. They charge the Coast Guard with two critical omissions. First, plaintiffs contend that Smith violated the SAR Manual by not directing his surface swimmers to enter the water to try to rescue the victims. However, the Addendum only allows surface swimmers to attempt to direct

trapped persons out of a capsized vessel if they can do so "without diving under the vessel." Addendum, *supra,* § 6.C.3. There is no evidence that the surface swimmers could have directed the victims to safety without entering the hull.

Second, plaintiffs claim that the Coast Guard should have inquired whether any of the vessels at the scene had an air compressor that could be used to inject clean air into the hull. Had they done so, the Coast Guard would have learned that HOUMA was equipped with an air compressor. Plaintiffs assert that Barone should have tried to get an air line up into the hull or through the hull by drilling a hole in the hull to give the victims more air. Barone replied that he would not have tried to inject air even if he had known about the HOUMA's air compressor, stating: "It depends on timing. The air pocket is very delicate, there was a line on the boat, it was stable. And we had divers en route. The risk of interrupting the air pocket and having the boat shift and go down or people run out of air, would have been great." (Tr. 2–24.) That calculation was not unreasonable.[31]

Moreover, even if the failure to take these actions was negligent, the Coast Guard can not be held liable because these omissions did not worsen the position of the trapped mariners. Injecting compressed air might have increased the chances of a successful rescue, but the failure to do so did not increase the risk of harm.

### 5. *Helicopter Transfer*

Plaintiffs claim that the helicopter lowered the divers too close to the HEATHER LYNNE and that its rotor wash caused her fatal roll is not supported by the evidence. This last minute argument relies solely on the fact that the boat rolled while the helicopter lowered the divers. However, there is considerable evidence

---

**31.** Although the HOUMA had an air compressor, plaintiffs did not introduce any evidence indicating whether the tug also had air lines that were long enough to pipe the compressed air into the hull.

that the roll began well before the helicopter returned to the scene. At 6:40 a.m., the tug operator reported that the vessel was beginning to list. He made a similar report at 6:47 a.m. Also, Smith observed that, throughout the diver transfer, the HEATHER LYNNE remained outside the rings in the water that were created by the rotor wash. Plaintiffs have not produced any percipient or expert witness to challenge his testimony, nor have they offered any expert testimony concerning the minimum distance from the accident that the helicopter could have safely lowered the divers. Therefore, I find that plaintiffs have not established by a preponderance of the evidence that the helicopter's rotor wash caused the HEATHER LYNNE's fatal roll.

## IV. ORDER

For the reasons herein, I order entry of judgment in favor of the defendant.